JOEL W. HATT et al., executors of William King,

*v.*

ELEAZER C. RICH et al.

EDMUND P. BACKUS

*v.*

HENRIETTA S. HATT.

[Filed March 26th, 1900.]

1. Specific performance of a contract for sale will be decreed, although the title is claimed to be disputable, where it appears that the doubts suggested relate to steps in the title which are fully presented to the court, the validity of which can readily be determined, and which, when examined, present no obstacle to the making of an efficient deed under the contract, passing a merchantable title in fee-simple.

2. A power of sale given to executors which authorizes them to sell and convey all the testator's real estate at their discretion, is efficient to support a sale by the executors, not only of all the territorial extent of the lands whereof the testator died seized, but also of all his title interest therein, and their sale under the power will divest the estate of residuary devisees, and of all those claiming under them.

3. Such a power does not lose its efficiency because the debts and legacies are paid, nor by mere lapse of time, when it may still be used to accomplish purposes which the testator may have had in view, or to carry into effect the

conversion and setting apart a share to be held in trust for one of the testator's children, according to the terms of his will.

4. The right of the executors to execute the power, and thereby to convey the fee whereof the testator died seized, is superior to the right of partition, held by the purchaser of an undivided interest from a residuary devisee.

On bill for specific performance and answer. On bill for partition and answer.

In the first of these suits, the executors of William King's will seek to compel the performance of a contract they made with the defendant Rich, to convey the homestead property of Mr. King, in East Orange, under a power of sale in his will. This suit is defended because it is contended that the executors' power of sale is not efficient to convey a merchantable title.

In the second suit, Backus, the complainant, is the purchaser of an undivided one-seventh share of the estate of William King, including his homestead property, and seeks to compel a partition or sale. The defence is, that the executors must exercise the power to realize the funds to be invested for Elizabeth Wright's share; that they have contracted to sell the homestead property under their power, which is superior to the devise under which Backus has acquired his title, and that the terms of the will and codicil, and the circumstances of the estate, require that the power of sale shall be used to sell all the testator's lands, and that the execution of the power will divest the estate of Mr. Backus and of the others who claim, like him, under the devise.

These causes both present the question of the validity of the power of sale given in the will of William King to be exercised at the discretion of his executors, and were for this reason heard together.

William King by his will, dated March, 1874, gave and devised all his estate to his wife during her life, for the support, &c., of herself and their unmarried daughters. The third clause of his will is in these words :

" *Third.* After the decease of my wife, I give the use of my homestead property, on Grove street, in said township of East Orange, including the lot on

which the barn and carriage-house stands, and all my furniture, implements, utensils and articles of personal property belonging to and in use in and about my said homestead to such of my daughters as may then be unmarried during their lives, and so long as they remain unmarried and continue to occupy my said homestead as a residence. Upon the death or marriage of all of my said unmarried daughters, or upon their ceasing to occupy my said homestead as a residence, I direct that said homestead property, furniture and articles of personal property referred to in this clause of my will shall sink into the residue of my estate and be disposed of under this clause of my will except as otherwise hereinafter provided. It is my intention to give my unmarried daughters a home so long as they remain unmarried, but that they shall have no right to lease my homestead and receive rent therefrom, but upon their ceasing to occupy the same as a residence the same shall become part of the residue of my estate and be disposed of as therein provided."

He bequeathed one money legacy of $5,000 to his granddaughter Anna King, payable after the death of his wife, and then follows the residuary clause, in the sixth item of his will, by which he gave and bequeathed, in these words:

"All the rest and residue of my estate, real and personal, whatsoever and wheresoever, to my seven children, namely, Phœbe J. King, Henrietta E., wife of Joel W. Hatt; Fannie M. King, John J. King, Lenora W. King, Elizabeth King, and to their heirs, executors and administrators and assigns forever."

The last item appoints the executors and creates the power of sale, as follows:

"I constitute and appoint my said wife, Mary, and my daughter Phœbe J. King, my son John J. King and my sons-in-law Joel W. Hatt and Edward L. Conklin, and the survivors and survivor of them, executors of this my last will, and hereby authorize and empower my said executors, and the survivors or survivor of them, to sell and convey all my real estate, in their discretion, at public or private sale. The homestead property not to be sold until the same shall sink into the residue of my estate as hereinbefore provided."

By a codicil made in 1879, he ratified his will save as to the share given to his daughter Elizabeth, as to which he, by the codicil, made the following provisions:

"I now declare that it is my will that instead of her receiving the share or portion of my estate as therein provided, such share or portion shall be invested by my executors in safe bonds and mortgages, on improved real estate, having dwelling-houses erected thereon; the value of said real estate to be at

least double the amount invested, and to be situated in the county of Essex, New Jersey; and the income thereof paid to her, my said daughter Elizabeth King, during her natural life, as the same shall be received; at the death of my said daughter the share or portion shall vest in her lawful issue, share and share alike; provided, however, that in case my said daughter shall die leaving lawful issue before such issue shall have reached the age of maturity, then it is my will that the income only, arising from said share or portion of my estate, shall be devoted to the maintenance and support of such issue until they shall severally reach maturity, at which time the share coming to each child shall be then paid to him or her. In case my said daughter Elizabeth King shall die without lawful issue, then it is my will that said share or portion shall be divided equally between my children, Phœbe J. King, Henrietta S. Hatt, Fannie M. King, John J. King, Lenora K. Conklin and Isaac W. King, and the survivors or survivor of them, share and share alike, the issue of any deceased child taking the share to which said child would have been entitled if living. I further declare it to be my will that in case my said daughter Elizabeth King shall at any time marry, then the income hereinbefore provided to be paid to her shall, under no circumstances, be subject to any claim, demand, influence or control of her husband, but the same shall be paid to her for her own separate use and benefit.

" I hereby nominate and appoint as trustees of said share or portion of my estate set apart for the use of my said daughter, the executors named in my last will and testament."

William King died in 1882, seized in fee of several tracts of land, including his homestead, referred to in the bills of complaint. His will was proven in the same year, by all the executors.

Mary King, the widow, died on October 28th, 1885. The daughters of the testator, who were then living and unmarried, were Phœbe J. King, Fannie M. King and Elizabeth Wright, a widow.

The homestead was occupied by Mary King, the testator's widow, during her life, and on her death by Phœbe, Fannie and Elizabeth. Phœbe afterwards died, and Fannie married, leaving Elizabeth the sole occupant. She found the homestead property to be too large for her sole use, and voluntarily ceased to occupy it, and expressed her desire to have the homestead sold under the executors' power. With her consent, upon her ceasing to occupy the homestead, the executors, on August 23d, 1897, entered into a written agreement for the sale of the house and lot at the southwesterly corner of Grove and New streets (part

of the homestead property) for $15,000, to the defendants, Eleazer C. Rich and Helen C., his wife. Copy of the agreement is annexed to the bill.

The cash payment under the agreement has been paid. The deed has been executed by the executors to Mrs. Rich, with her assent, by her husband's request. The bond and mortgage securing payment of the purchase-money have been made by them. The conveyances have been approved by both parties; a check for the additional cash drawn, and all these papers have been deposited in escrow until the vendors shall satisfy themselves that the deed of the executors conveys a fee-simple estate clear of encumbrances. When that is ascertained the papers shall be delivered and recorded. The proposed vendees have been put into possession of the premises pending an investigation of the title.

The vendees refuse to accept delivery of the deed, alleging that it does not convey a good, merchantable title. The objections are based upon these facts : Isaac W. King's undivided share under the devise to him has been made the subject of several conveyances, as to which disputes have arisen, finally resulting in a sheriff's sale of his undivided interest in all the King estate, including the homestead property to Edmond P. Backus, the complainant in the above-named partition suit. Phœbe J. King's share is held, since her death, by her devisees. Neither the devisees named in William King's will nor those claiming under them have joined with the executors in the deed under the contract to convey to Rich. That deed purports to convey a fee-simple estate, solely by virtue of the power of sale given to the executors in William King's will. The defendants Rich claim that the power is void, and deny the efficiency of a deed made under it to pass a fee as against the devisees and those claiming under them, upon grounds hereinafter considered.

The partition suit is prosecuted by Edmond P. Backus, the purchaser at sheriff's sale of Isaac W. King's undivided one-seventh interest in his father's estate. He alleges that by the terms of the will the only purpose for which the power of sale in William King's will could be exercised was the payment of

his debts and legacies, and that these have all been accomplished, and that there remains no object in keeping such power alive. He prays a partition or sale of the premises.

The defendants are the King family, who have the other undivided six-sevenths of the estate, and the trustees under the William King will and codicil. They contend that the estate of Backus, as owner of Isaac W. King's undivided one-seventh, and the estates of all the other devisees under William King's will, and of those claiming under them, are subject to the power of sale given by him to his executors. They set forth the executors' agreement to convey to Mrs. Rich a part of the homestead property under the power of sale, and the pendency of the above-named suit for specific performance of that agreement. They allege that all the owners of the devised shares, except Backus, are advised and believe that the executors have full power to convey in fee-simple to Mrs. Rich. They deny that the power is obsolete, and insist that it is yet in full force.

*Mr. Philemon Woodruff,* for the complainant in the bill for specific performance, and for the defendants in the partition suit.

*Mr. Louis Hood,* for Rich and wife, defendants in bill for specific performance.

*Messrs. De Witt & Provost,* for Edmond P. Backus, the complainant in the partition suit.

Grey, V. C.

The testator, William King, died seized of an estate in fee-simple. The effect of his will in disposing of his real estate was to devise to his wife an estate during her life, in the whole of it, for certain prescribed uses, and, upon his wife's death, to such of his daughters as were then unmarried an estate in his homestead and its equipment during their lives, which was subject to be defeated by their marriage, or their ceasing to occupy the homestead as a residence; and to his seven children a remainder in fee in the whole estate, including the homestead, which, sub-

32

Hatt v. Rich.

ject to the two succeeding life estates, vested in the devisees immediately upon the death of the testator. This was the devolution of the title. All of these devises were subject to the power of sale given to the executors, to be exercised at their discretion, but postponed as to the period of its exercise upon the homestead property until it should become a part of the residue, by the termination or defeat of the unmarried daughter's life estate.

The nature of the power is apparent. There is no direction to sell, but there is the fullest authority to do so, at the discretion of the donees. In such cases the land retains its character as land, until it is actually sold. *Cook's Executor* v. *Cook's Administrator, 5 C. E. Gr. 377.* Meanwhile, by the testator's residuary devise, the title to the lands vested in his children, subject to be divested by the execution of the power by the executors.

The actual operation of the will was that Mr. King's wife outlived him and enjoyed her life estate under his will. Upon her death, in October, 1885, there were these daughters unmarried: Elizabeth Wright, a widow; Phœbe J. King and Fannie M. King. In these daughters, upon their mother's death, an estate for their lives vested, subject to be defeated by the death or marriage of all of them, or by their ceasing to occupy the homestead as a residence. Phœbe died in 1894, unmarried and testate. Fannie married in 1894, and "ceased to occupy," and the estate remained dependent on Elizabeth's death, marriage or "ceasing to occupy" the homestead.

There might be some question whether Elizabeth, who had been married after her father's but previous to her mother's death, and had at the time of her mother's death become a widow, was, at the latter date, unmarried, so as to be within the class of devisees prescribed by the testator. In *Maberly* v. *Strode, 3 Ves. *453,* Sir Richard Pepper Arden, M. R., declared that legacies given to unmarried daughters would not go to widowed daughters, unless there were other indications of the testator's purpose. That the word "unmarried" meant never having had any husband at all. In *Bell* v. *Phyn, 7 Ves. *458,*

Sir William Grant, M. R., was of opinion that the expression " without being married " must be construed " without having ever been married." All constructions of single words or phrases must, however, be controlled by the evidences of the testator's intent as shown by the whole will. In this will the testator, upon the death of his wife, devises the homestead " to such of my daughters as may then be unmarried, during their lives, and so long as they remain unmarried and continue to occupy my said homestead as a residence." The gift here is to daughters who at the time of the death of the wife should be unmarried, no matter what their previous condition might have been. The testator, by his provision as to the residence in the homestead, and the possibility of their subsequent marriage, contemplated all of his daughters whose single condition at the death of his wife might enable them to use his homestead as their family residence, and did not intend to make the fact that any of them, though single then, and living at home, might previously have been married, a ground of exclusion from his gift. In *Doe* v. *Rawding, 2 B. & Ald. 452,* it was held that the word " unmarried " may be taken to mean "not married at the time," if that construction be necessary to make it operative. The testator seems to have intended the gift to go to any daughters who might marry, for he provides that their subsequent marriage should defeat the estate. This would not exclude a widowed daughter.

This point is of minor significance, as the life estate of Elizabeth, conceding that she took under the devise, has, as both parties admit, been defeated by her " ceasing to occupy " the homestead as her residence, and it therefore does not interfere with the passing of a perfect title to the defendants. If she was not within the class of unmarried daughters the same result follows.

All the unmarried daughters have now died, married or " ceased to occupy " the homestead, and their life estate has thus been defeated and has fallen into the residue as prescribed by the will. The executors now propose to execute the power of sale by selling the homestead property. The defendants in the

bill, for specific performance of the contract to purchase part of the homestead property, deny the executor's right to execute the power upon several grounds. The first, second, third and fifth grounds, set up in their answer, contend that the power is inefficient to convey a merchantable title as against the estate which vested in the devisees under the residuary clause of William King's will and which is now in Backus and others, claiming under the devisees.

In the partition suit, Messrs. Hatt and Conklin, who are the surviving executors of the will of William King and are also, under his will, trustees, &c., for his daughter Elizabeth Wright, are made defendants, not in terms as executors but as trustees. The premises of the partition bill, however, set forth the executors' power of sale and their claim of a right to exercise it, and the prayer is that a partition or sale may be made "free, clear and discharged of the power of sale given under the will of William King, deceased," &c. In this case the parties are in court and have submitted themselves to its jurisdiction. The matter of the bill clearly relates to a subject touching which they have answered, and the mere omission to name the special capacity in which they are pleading will not affect the proceedings. *Walton* v. *Herbert, 3 Gr. Ch. 73; Evans* v. *Evans, 8 C. E. Gr. 75; White* v. *Davis, 3 Dick. Ch. Rep. 24.*

The complainant Backus, in the partition suit, also disputes the validity of the power of sale and its superiority to the estate which, by the will, came to the residuary devisees, under one of whom he claims.

In both suits the question is therefore presented whether the executors' power of sale may now be exercised to convey a title to the lands passing as residue which will be superior to that which vested in the devisees. That the power of sale is well expressed in the will to accomplish that purpose is beyond dispute. The testator, who devised the estates in remainder in fee, created the power and made it applicable, as he expressed it, to "all my real estate." This included the whole of the testator's real estate, not only to the territorial expanse of all his lands but also to the extent of all his title interest therein. *Barry* v.

*Edgeworth, 2 P. Wms. 524; Jackson v. Merrill, 6 Johns. 191.*
He also authorized the executors to sell and convey at their
discretion—that is, at such prices, on such terms and for such
estates as they might deem proper. The power also included
the homestead property, but touching the time when the power
might be exercised upon the homestead, the testator prohibited
its execution until that property should "sink into the residue,
as hereinbefore [in his will] provided"—that is, until the life
estate of the unmarried daughters should terminate or be de-
feated. This event has now completely happened.

It is claimed that the executors' power has become void be-
cause the debts and legacies have been paid, and there is no
occasion for its exercise. The opinion of Chancellor William-
son, in *Brearley v. Brearley, 1 Stock. 24*, is brought forward as
sustaining this proposition. It seems to be assumed by the de-
fendants that although a testator may have created a power in
clearly-expressed terms, which gave to his executors unlimited
authority to sell all his real estate at their discretion, yet they
will not be permitted to exercise the power at their discretion as
authorized by the testator, but only when it is necessary to be
used to raise money to pay debts or legacies. This is not the
doctrine of *Brearley v. Brearley*. The learned chancellor in
that case states explicitly, touching the creation of powers, that
it is the will of the testator which must be executed, however
unreasonable it may appear to be. That the testator may dis-
pose of his property arbitrarily, " without giving any reasons for
the disposition he makes of it," and that where no ambiguity
of language or phraseology makes doubtful what the testator's
intention is, the absence of all motive on the face of the will, or
inability to ascribe a motive for the disposition made, because
of the circumstances of the testator and his family, are entitled
to no consideration (at *p. 25*). He further declares that as to
the question of the testator's intent in creating powers, each case
must stand in great measure upon its own peculiar circumstances
(at *p. 32*). In that case he was of opinion that there was no
such clear expression of the testator's intent upon the face of
the will, as excluded an ascertainment of his purpose from at-

Hatt v. Rich.

tending facts, and these he held, showed that the testator did not intend that the executors should exercise the power of sale, when, if executed, it would, without reason, convert the lands, which had descended to heirs, into money, against their united opposition.

Each of the numerous other cases cited against the exercise of the power stands upon the expressions of the will in the particular case, and if they were ambiguous, then upon the circumstances of the testator's property and his family, &c., or beneficiaries. They afford but little aid as precedents because each case varies in essential particulars of its facts from that under consideration. The cases most nearly resembling that under consideration are *Bacot* v. *Wetmore, 2 C. E. Gr. 250,* and on the same will, *Wetmore* v. *Midmer, 6 C. E. Gr. 245.* See, also, *Cruikshank* v. *Parker, 7 Dick. Ch. Rep. 310.*

In the case in hand, the donation of the power to the executors is expressed in the plainest terms, without any ambiguity, and the application of the more modern rule that "the courts have decided that powers, although framed in general terms, are limited by the nature of the limitations contained in the * * * will" (*Peters* v. *Lewes Railroad Co., 18 Ch. Div. 433*), is needed to justify any further discussion of its extent.

This doctrine is entirely acceptable where the will in terms, or by necessary implication, indicates the purposes to which the testator intended the use of the powers to be limited. But where the will creates an unlimited power in unquestionable terms, yet exhibits no objects save a desire for the exercise of the discretion of the donee, there is some danger that in holding that the powers may not be enforceable, some unexpressed purpose of the testator may be defeated.

The power given to the executors is, by the express terms of Mr. King's will, exercisable at their discretion, without limit of time or circumstance, save as to the homestead property. If, despite this fact, there must be, in order to validate the power, some additional indications of the objects for which the testator intended it should be exercised, the will itself and the circumstances of this case are not lacking in the exhibition of such indications.

Taking up the claim that the power cannot be used to convey a merchantable title to the homestead property. That the testator created the power, that he contemplated its exercise by the executors upon the homestead property, that he postponed their action under their discretion, so that they should not sell the homestead until the last of the unmarried daughters had either married, ceased to occupy it, or died, appears in the very words of the will.

It is assumed by the defendants that the payment of debts and legacies must have been the only matter for which the testator intended the power to be exercised. The face of the will indicates that while the testator intended the homestead property to be sold under the power, it is highly improbable that he had any purpose that its proceeds should go to pay either debts or legacies. This is strongly inferable from the fact that, although the power was undoubtedly extended over the homestead property, the testator postponed the time when the executors might exercise it upon that property to the end of two successive life estates in it. The testator must be presumed to have known the law, that all his debts must have been paid long before the sale of the homestead (which he contemplated after two life estates had expired) could have been effected under the power so postponed.

As to the legacies, the $5,000 gift to Annie King, the grand-daughter, is the only one in the will for which money had to be raised. The testator postponed the payment of this legacy until the death of his wife, and as he postponed the sale of the homestead under the power still further, beyond the life estate given to his unmarried daughters after the death of his wife, it is evident he did not expect the power to be exercised to raise the legacy. In this aspect of the case, both the debts and the legacy had to be paid before the power could be used to sell the homestead. Yet the very words of the will show that the testator contemplated the use of the power to sell the homestead. How, then, can it be said that the unlimited discretion which the testator gave to sell the homestead must be limited to be used for two purposes only, when, by the expressed terms of his will, it

Hatt v. Rich.

could not have been used for either of those purposes? Must it not be believed that he meant what he said—that the executors should use the power at their discretion; that is, for any purposes?

Considering that the homestead property has now, using the testator's words, "sunk into the residue," is the executors' power of sale yet forceful to convey a title which is merchantable, and which will divest the fee held by the devisees of the residuary estate?

The contestants insist that the satisfaction of the debts and legacies has nullified the power. The decisions, in cases where a showing of objects for the execution of general powers has been required, have not limited the execution of such powers to the payments of debts and legacies. On the contrary, such general powers appear to have been held valid wherever the court has been able to ascribe to a testator any purpose consistent with the circumstances of his estate and his relations to his beneficiaries. An intent to "secure dominion over his estate," and to "limit the expenses incident to conveyance" (Lord Elden, in *Maundrell* v. *Maundrell, 10 Ves. 265*), "convenience of distribution" (Chancellor Williamson, in *Brearley* v. *Brearley, 1 Stock. 31*), "convenience of division" (*Smith* v. *Claxton, 4 Mad. Ch. 493*), have all been referred to as objects which would sustain the validity and exercise of a general power. In Mr. King's case it is not difficult to believe that, with his large family of sons and daughters, to whom he had given a considerable estate in undivided shares, the lands lying in various parcels, the testator might well have anticipated the very situation which has now happened, that by reason of some financial misfortune the undivided share of some one or more of the family might come to the ownership of a stranger whose interests and feelings would be foreign to those of the family, and in order to preserve "dominion over the estate," and the power to dispose of the property by the action of those in whose discretion he trusted, rather than at the instance of strangers, he created the power which could be exercised at the will of his executors (also members of his family) who could thus compel a realization at such times,

in such manner, at such prices and on such terms as they might deem most beneficial.

There is, however, a further indication of the testator's intention regarding the exercise of the power arising out of the provisions of the codicil to his will, which is applicable to the whole of his real estate. The will and the codicil speak as an entirety, and from the time of the testator's death. He made his will in 1874, and his codicil in 1879. By the codicil he ratifies his will, save as to Elizabeth's share. The complainants in the partition bill assume that this was a ratification of the residuary devise under which they claim, but they do not recognize the attendant fact that it was also a ratification of the power in the will which dominated their devise. By the codicil the testator revokes and alters his will, so far as it relates to the share devised to Elizabeth, and declares his will to be as follows:

"I now declare that it is my will that instead of her receiving the share or portion of my estate as therein [in the will] provided, such share or portion shall be invested by my executors in safe bonds and mortgages, &c., * * * and the income thereof paid to her, my said daughter, Elizabeth King, during her natural life, &c., with limitation over to issue of Elizabeth, or, on failure of issue, to the survivors of her brothers and sisters or their issue."

The testator, by the codicil, contemplated a conversion of the share devised to Elizabeth. It was to be invested in safe bonds and mortgages. Income therefrom was to be paid. The whole scheme and the phrasing of this codicil show that the testator was dealing with Elizabeth's share as a fund and not as land. He then appoints as trustees the executors named in the will. His language is, "as trustees of said share or portion of my estate set apart for the use of my said daughter Elizabeth." Elizabeth's share is thus considered by the testator as "set apart"—that is, to be severed from the rest of the estate.

The testator, when he made this codicil providing that the devise given in his will to Elizabeth should be revoked and that her share should be set apart and invested to produce for her an income, had before him the will by which Elizabeth's share was but an undivided interest, intermingled with other shares. He did not himself, by a self-executing codicil, sever her portion.

He also had before him that provision in his will whereby the executors, whom he made trustees for Elizabeth, might sell the whole estate at their discretion, and thus effect a severance of Elizabeth's interest and its realization into a fund which might be invested for her benefit. The testator plainly left the severance and setting apart of Elizabeth's share to be done by his executors. There is no way by which the trust fund for her could, under the scheme of the will and codicil, be set apart for her out of the undivided interests save by executing the power of sale.

If, therefore, reasons for the exersise of the power of sale for other than payment of debts and legacies must be found, to justify its execution (notwithstanding the words of the will disclose a clear intent of the testator to give an unlimited discretion), they are, I think, apparent upon the face of the will and codicil, not only in the purposes which may fairly be ascribed to the testator but also in those which the scheme of the testamentary dispositions force into recognition.

The exercise of the power by the executors is further challenged because it is claimed to be stale, or to have become void for want of exercise within a reasonable time.

So far as this applies to the sale of the homestead property, the power was exercised substantially coincidentally with the opportunity to exercise it. The testator postponed its execution until the life estate given to his unmarried daughters should "sink into the residue." This did not happen until they died, married or "ceased to occupy" the homestead. The defeat of this estate happened by the cessation of the occupation of the homestead, because of Elizabeth's removal therefrom, which occurred within a few weeks before the making of the deed now deposited in escrow.

The delay in exercising the power upon the residue of the estate of the testator has not invalidated it. During Mrs. King's life up to 1885, while she had the right to the whole estate for the benefit of herself and her unmarried daughters, of whom Elizabeth was (for a time) one, it can readily be understood that the executors found no occasion to separate Elizabeth's

share. After Mrs. King's death, so long as the undivided interests were held in the ownership of the family, the provision for Elizabeth was a matter of family arrangement. Now that a necessity for dealing with a stranger has arisen, the executors seek to exercise that dominion over the estate which the testator left to their discretion, and subject to which the stranger bought.

The court of appeals, in *Morse* v. *Hackensack Savings Bank*, *2 Dick. Ch. Rep. 287, 290*, discusses the effect of mere delay in the exercise of an unlimited testamentary power of sale, and declares that no case has come under its observation in which a limitation of time has been imposed upon a power in the nature of a trust, not limited in terms, unless the rule against perpetuities is involved, or the power is controlled by an inherent quality in the nature of a trust, or by the object for which it is created. It is true that the controversy in this case as to the validity of the power has arisen some twelve years since Mrs. King's death, but there is no showing that the purposes of the testator to set Elizabeth's share apart, and have it invested, have ever been carried out, nor that any fraudulent use of the power is intended; nor that its present exercise is against public policy in that it may offend the rule against perpetuities, nor does any reason appear why the trust reposed by the testator in the discretion of the executors should not be performed by the use of the power.

Mr. Backus, the complainant in the partition suit, holds his title under the conveyance of Isaac King's undivided share of the estate. As devisee of an undivided share, Isaac was a mere volunteer, and his estate was subject to the exercise of the superior power created by the testator, who gave him his share. It is quite possible that Mr. Backus, in making his purchase of Isaac King's undivided interest in the estate, subject to the executors' power of sale, discounted the disadvantages to which the share was subject, by the lesser price which he paid. However this may be, he certainly bought with full notice of the superiority of the power of sale over the undivided interest which he purchased, and has therefore no equity now to complain. That the exercise of the power will cut out the estate which

vested by the devise was determined against a subsequent purchaser of such a devised share at a sheriff's sale in *Wetmore* v. *Midmer, 6 C. E. Gr. 243*.

There is no room in this case for the doctrine of election, whereby, when the whole of the proceeds in the lands to be sold under a power belong to the persons who held the title, courts of equity will protect the choice of the beneficiary to retain the title to the land, rather than to take the proceeds under the execution of the power. The whole beneficial interest is not in Mr. Backus. All the other beneficiaries join in asking that the power be exercised. To enforce the testator's intent as to Elizabeth's share, it is necessary that the power be exercised. There is a limitation over of her share, which is contingent. Mr. Backus, being the holder of but an undivided share, cannot alone elect to take the property as land, and thus defeat the operation of the power. *Fluke* v. *Fluke, 1 C. E. Gr. 481*.

It is also objected, in the specific performance suit, that the deed in escrow is not executed by John J. King, originally one of the executors, but who has been removed by an order of the orphans court. This criticism was not urged with much insistence. It has been finally settled by the court of appeals in *Denton* v. *Clark, 9 Stew. Eq. 538*, approving of the more elaborate exposition of the question in *Weimar* v. *Fath, 14 Vr. 1*. The law on the point is declared to be "that when a will gives executors in their official capacity a power to sell, without naming individuals who are to be clothed with such capacity, * * * and one of such executors is removed from the office, the power to sell survives, and it can be legally exercised by the remaining executors." The conditions stated apply in this case. The power is efficiently exercised without John J. King joining in the making of the deed.

In the specific performance case, the complainants have shown that they have power to convey to Mr. Rich, by the deed of escrow, a fee-simple estate in that part of the homestead property which is proposed to be granted by that deed, and that the title which will thus pass is not questionable, so that its accept-

ance would put upon the defendants the risk which might attend upon settling it. *Lippincott* v. *Wikoff, 9 Dick. Ch. Rep. 109.*

In the partition suit the power of sale under William King's will, which the executors claim the right to exercise, must be held to be superior to the right of partition or sale acquired by Mr. Backus by his purchase of the undivided interest of Isaac King in the devise to the latter under that will. The executors are bound to exercise that power in order to carry into effect the codicil of the testator regarding the share of Elizabeth, which he directed to be invested and set apart by her trustees, and which must be so delivered to the trustees that they may perform their duty in that regard. The power is superior to the estate of the residuary devisees and of those claiming under them. They have held the fees since the death of the testator, and are entitled to the profits of the lands (except the homestead property) from the time of Mrs. King's death to the time of the execution of the power. *Morse* v. *Hackensack Bank, 2 Dick. Ch. Rep. 283.* Their fee will be divested by the execution of the power, but this can work no hardship to Mr. Backus, the purchaser of Isaac's share, for he bought Isaac's undivided interest in a devise which came to him by the same will which gave to the executors the superior power to sell the whole estate. The most that Mr. Backus could acquire by his deed was Isaac's place. The several residuary devisees, and those claiming under them, will, of course, be entitled to their several shares in the purchase-money arising from the execution of the power.

Decrees will accordingly be advised for the complainants in the specific performance suit, and for the executors and trustees under William King's will in the partition suit.