WILDLIFE PRESERVES, INC., APPELLANT AND CROSS-RE-
SPONDENT, v. BOROUGH OF LINCOLN PARK, RESPON-
DENT AND CROSS-APPELLANT, AND DEPARTMENT OF
ENVIRONMENTAL PROTECTION AND STATE OF NEW
JERSEY, RESPONDENTS AND CROSS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 24, 1977—Decided June 29, 1977.

534

536

Before Judges LYNCH, MILMED and ANTELL.

*Mr. Donald A. Kessler* argued the cause for appellant and cross-respondent Wildlife Preserves, Inc. (*Messrs. Meyner, Landis & Verdon,* attorneys).

*Mr. John F. Feeney* argued the cause for respondent and cross-appellant Borough of Lincoln Park (*Messrs. Scangarella* and *Feeney,* attorneys).

*Mr. John M. Van Dalen,* Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

MILMED, J. A. D. On July 30, 1975 appellant Wildlife Preserves, Inc., (Wildlife) applied to the Department of Environmental Protection (Department), under the Green Acres Tax Exemption Program, *N. J. S. A.* 54:4–3.63 *et seq.,* for tax exemption on nine parcels of real property, totalling approximately 150 acres, located in the Borough of Lincoln Park (borough). Following notice to interested parties, a written objection was filed by the borough. Thereafter, a public hearing was held on the application, at which time the borough, participating through its attorney and tax assessor, advanced various reasons why the property under consideration was not suitable for a Green Acres tax exemption. The Commissioner of the Department of Environmental Protection (Commissioner) certified the eligibility

of five of the lots for real property tax exemption and denied such certification in regard to the remaining four lots. The property was found to be "within a recognized conservation area known as Great Piece Meadows," and as falling within the State's objectives of preserving "lands in the Passaic River Valley for flood control and conservation purposes." The reason given for denial of certification of eligibility for real property tax exemption as to four of the lots was "Insufficient Evidence of Ownership." We now have before us the appeal by Wildlife from the denial, and the cross-appeal by the borough from the grant, of certification

Wildlife argues that the determination by the Commissioner that there was insufficient evidence of its (Wildlife's) ownership of the four lots to warrant their being certified as eligible for tax exemption was arbitrary, capricious and unreasonable We disagree The essential facts are not in dispute. The four lots in question are Lot 28[1] in Block 3 and Lots 4, 10 and 30 in Block 136. In "Initial" statements submitted in connection with its application for tax exempt status on Lot 28 in Block 3 and Lot 4 in Block 136 Wildlife claimed "partial" title to the respective parcels. In its "Initial Statement" regarding Lot 10 in Block 136, it stated that title to that parcel was vested in itself "by unrecorded, and lost, deed";[2] that "Record title" was "in Gor-

---

[1]In his letter of September 24, 1975 to the Chief of the Office of Legal Services and Real Estate of the Department of Environmental Protection, the then attorney for Wildlife Preserves, Inc. stated, in regard to the Commissioner's "disallowance" of Wildlife's application for tax exemption for this lot, "We do not quarrel with this disallowance."

[2]"The existence of any lost or destroyed deed * * * may be established by judgment in the superior court in an action brought in a summary manner or otherwise." *N. J. S. A.* 2A:47–1. A certified copy of such judgment "shall be recorded * * * and a certified copy of such record shall be received in evidence as fully as the original deed * * * would be if produced or proven." *N. J. S. A.* 2A:47–3. There is no indication in the record that Wildlife ever undertook to pursue this statutory remedy to establish its "lost" deeds.

don Loery who was agent for Wildlife Preserves"; and that a "Replacement deed" was "being obtained." In its "Initial Statement" regarding Lot 30 in Block 136, Wildlife stated that title to the parcel was vested in it "by unrecorded, and lost, deed"; that "Record title" was "in W. W. Howell who was agent for Wildlife"; that Howell was deceased, and that a "Replacement deed" was "being obtained from his executor."

In the brief submitted on behalf of Wildlife on this appeal, counsel includes the following statement of facts:

In its application for tax exempt status, Wildlife explained that the title of the property in issue was vested in Wildlife by an unrecorded and lost deed and that record title for certain parcels of the property is in the name of W. W. Howell, who was an agent for Wildlife and other parcels were recorded in the name of Gordon Loery, who also was an agent of Wildlife Preserves. The application further indicated that Howell is deceased and that Wildlife is in the process of obtaining replacement deeds from Howell's executor so that title could be recorded in Wildlife's name (Aa–7). At the informal meeting with representatives of the Department of Environmental Protection on September 10, 1975, representatives of Wildlife discussed the lost deeds. Howard Stokes, attorney for Wildlife at the proceedings below, presented the Department with xerox copies of the deeds which were lost (Aa–32). On September 24, 1975, Wildlife sent a letter, together with a memorandum which indicated that the parcels which had been recorded in the name of Gordon Loery were recorded in the name of Wildlife Preserves on September 10, 1970 [sic] (Aa–34 to Aa–37).

■ The Commissioner made his determination on Wildlife's application on the last day allowed therefor, i. e., on September 15, 1975. N. J. S. A. 54:4–3.67. From the record before us it is clear that on that cut-off day, on the basis of all of the information then before the Commissioner, the lots as to which certification was denied had not met an important prerequisite for Green Acres tax exemption specified in N. J. S. A. 54:4–3.64, i. e., they were not "owned and maintained or operated * * * by a nonprofit corporation or organization * * *." In the circumstances, we find no merit in Wildlife's claim that the Commissioner's denial of cer-

tification as to the four lots, because of insufficient evidence of ownership, was arbitrary, capricious and unreasonable. That determination was entirely reasonable and in keeping with the requirements of the statute.

■ Cross-appellant, the Borough of Lincoln Park, contends that the "exemption" statute, *i. e., N. J. S. A.* 54:4–3.63 *et seq.,* "is unconstitutional in that it delegates authority without sufficient guidelines." It argues that use of such "broad terms" as "conservation," "recreation," and "public interest" fails to provide the Commissioner with sufficient criteria for the making of his determinations.[3] We find no merit in the contention. The terms are not impermissibly vague.

*N. J. S. A.* 54:4–3.64 provides the following detailed eligibility requirements:

All lands and the improvements thereon actually and exclusively used for conservation or recreation purposes, owned and maintained or operated for the benefit of the public by a nonprofit corporation or organization organized under the laws of this or any State of the United States authorized to carry out the purposes on account of which the exemption is claimed and which is qualified for exemption from Federal Income Tax under Section 501(c)(3) of the Internal Revenue Code shall be exempt from taxation; provided, however, that the Commissioner of the Department of Environmental Protection certifies that the real property and the property owner are qualified under the terms of this act.

Beyond this, another section of the tax exemption legislation, *N. J. S. A.* 54:4–3.66, requires that the property be "open to all on an equal basis and that a tax exemption for such property * * * be in the public interest." It is thus clear that the Legislature has not granted uncontrolled power to the Commissioner. Rather, it has "provided specific safeguards to insure against unwarranted or arbitrary action and

---

[3]We note that the Commissioner has, pursuant to the rule-making power provided by the statute, *N. J. S. A.* 54:4–3.70, specifically defined the phrase "Public recreation and conservation purposes." *N. J. A. C.* 7:35–1.2.

untrammeled administrative discretion." *Ward v. Scott,* 11 *N. J.* 117, 126 (1952). See also, *Avant v. Clifford,* 67 *N. J.* 496, 546–554 (1975).

What was said in regard to a municipal ordinance in *Grayned v. City of Rockford,* 408 *U. S.* 104, 92 *S. Ct.* 2294, 33 *L. Ed.* 2d 222 (1972), is equally applicable here, *viz.*:

Condemned to the use of words, we can never expect mathematical certainty from our language. The words of the Rockford ordinance are marked by "flexibility and reasonable breadth, rather than meticulous specificity," Esteban v. Central Missouri State College, 415 F. 2d 1077, 1088 (CA8 1969) (Blackmun, J.), cert. denied, 398 U. S. 965, 90 *S. Ct.* 2169, 26 *L. Ed.* 2d 548 (1970), but we think it is clear what the ordinance as a whole prohibits. [408 *U. S.* at 110, 92 *S. Ct.* at 2300, 33 *L. Ed.* 2d at 228–229]

See also, 1A *Sutherland, Statutory Construction* (4 ed. *Sands,* 1972), § 21.16 at 95–96.

The Green Acres tax exemption legislation, *N. J. S. A.* 54:4–3.63 *et seq.,* is bottomed on the following specific legislative purpose:

The Legislature hereby finds and declares that natural open space areas for public recreation and conservation purposes are rapidly diminishing; that public funds for the acquisition and maintenance of public open space should be supplemented by private individuals and conservation organizations; and that it is therefore in the public interest to encourage the dedication of privately-owned open space to public use and enjoyment as provided for in this act. [*N. J. S. A.* 54:4–3.63].

In light of the policy of the statute, there is no question regarding the meaning of its terms. The suggestion that it is void for vagueness is without substance.

The borough next complains of the "type of proceeding" utilized by the Department. It claims that the public hearing procedure used violated its "right to due process." In essence, it argues that the public was unaware of the hearing and "did not have the opportunity to attend," and that the Commissioner erred in failing to review the actual tape recording of the hearing before rendering his decision, and

in failing to set forth any findings of fact in support of his determinations. We disagree.

Initially, we note that *N. J. S. A.* 54:4–3.66 requires the holding of "a public hearing on the application," and that *N. J. A. C.* 7:35–1.5(c) and (d) provide for such public hearing. A trial-type hearing is neither mandated nor appropriate for determination of applications for certification under the statute. See 1 *Davis, Administrative Law Treatise*, § 7.06 at 429–432 and § 8.13 at 576–578 (1958), and *Supp.* (1970) at 327–330. The decision by the Commissioner that the particular parcel of real property and the owner thereof are or are not qualified under the terms of the Green Acres tax exemption statute involves essentially the resolution of nonfactual issues of law, policy and discretion. In such case "the appropriate oral process for resolving" the issues is "the method of argument, not the method of trial." Davis, "The Requirement of a Trial-Type Hearing," 70 *Harv. L. Rev.* 193, 195 (1956). And see, *Cunningham v. Civil Service Dep't*, 69 *N. J.* 13 (1975); *In re Environmental Protection Dep't*, 139 *N. J. Super.* 514 (App. Div. 1976). The public hearing prescribed by *N. J. S. A.* 54:4–3.66 and *N. J. A. C.* 7:35–1.5(c) and (d) is obviously for the purpose of giving interested persons an opportunity to present their views. The decision-making process here involved is, in essence, not concerned with resolution of disputed adjudicative facts, *i. e.,* "roughly the kind of facts that go to a jury in a jury case." *Davis,* "The Requirement of a Trial-Type Hearing," *supra,* 70 *Harv. L. Rev.* at 199. Accordingly, the procedure for certification by the Commissioner is not subject to the same hearing requirements that apply to a "contested case" under the Administrative Procedure Act (*N. J. S. A.* 52:14B–1 *et seq.*). See *Cunningham v. Civil Service Dep't, supra,* 69 *N. J.* at 23; *In re Environmental Protection Dep't, supra,* 139 *N. J. Super.* at 516; *Beckworth v. N. J. State Parole Bd.,* 62 *N. J.* 348, 358 (1973).

 We find no merit in the borough's claim that the public was unaware of the hearing on the matter "and did not have the opportunity to attend." It appears that a notice of public hearing was advertised in the *Lincoln Herald* on August 20, 1975 and that a copy of the notice with a covering letter, dated August 19, 1975, was sent to the applicant and the local tax assessor. The notice set forth the time and place of the hearings and invited all interested parties to participate in the hearings and "submit written statements relevant to specific applications." The notice also provided that:

Interested parties may also present oral statements at the hearing and must so notify the department of their "desire to speak" no later than August 29, 1975.[4]

Directions were given for forwarding the "written statements and the 'desire to speak' requests," and a termination date of September 8, 1975 was specified for receipt of any written statements.

 We also find no merit in the borough's claim that the Commissioner erred in failing to review the actual tape recording of the hearing before rendering his decision, and in failing to set forth any findings of fact and conclusions of law[5] in support of his determinations. There are ample

---

[4]The Department's "Staff Summary Report" in the matter notes that "As per the deadline there was one 'desire to speak' request from Lincoln Park Borough. No written statements were received. An informational hearing was held on September 9, 1975."

"The attorney and the tax assessor for Lincoln Park Borough appeared at the hearing to contest the eligibility of the application."

We note that due to a water crisis in Trenton at the time, the original hearing date of September 5, 1975 was, apparently without further publication, changed by the Department to September 9, 1975. The Attorney General correctly notes in the brief which he submitted on behalf of the Department that when this occurred, "no one was adversely affected because Lincoln Park was to be the only participant and Lincoln Park was notified of the rescheduled date."

[5]A "Staff Summary Report" was first prepared after the reconvening of the Department's "review committee" in August 1976,

findings and conclusions in the Staff Summary Report which was ultimately adopted by the Commissioner and which is now part of the record on this appeal. We also note that it was not essential that the Commissioner review the tape recording of the hearing before rendering his decision.

It was enough that it was available, *Fifth St. Pier Corporation v. Hoboken*, 22 *N. J.* 326, 331, 333–334 (1956) ; *In re Shelton College*, 109 *N. J. Super.* 488 (App. Div. 1970) ; 2 *Davis, Administrative Law Treatise*, §§ 11.03, 11.04 at 44–56 * *" *.
[*Abramson v. Farrell*, 122 *N. J. Super.* 30, 41 (App. Div. 1972)]

And, there is no indication that the Commissioner was not made fully aware of the evidence by the committee of the Department which reviewed the applications and analyzed the evidence.

While the statute requires a public hearing on an application, there is no requirement that the Commissioner himself preside over the hearing. *N. J. S. A.* 54:4–3.66. The procedure adopted for consideration of objections appears fair and conforms with due process principles. The tape of the public hearing was available and part of the record. Beyond this, the written statement filed by the borough with the Department in essence sets forth all of the objections raised at the hearing. There is nothing to indicate that the

---

during the pendency of this appeal. On October 29, 1976 the Commissioner adopted the Staff Summary Report "as the rationale" for his September 15, 1975 tax exemption decisions in the case. We granted leave to supplement the record on appeal and the Report is now before us. The "NOTE" attached to it reads:

Review of this application originally took place during August of 1975. Prior to the presentation of this application to the Commissioner discussions regarding its eligibility were held by a review committee including Curt J. Hubert, Howard J. Wolf, Robert L. Solan, and Lewis J. Nagy. On September 15, 1975 Commissioner David J. Bardin ruled upon the eligibility of the applicant and the land for an exemption under this program.

At that time no written findings were prepared. However, due to the pending litigation and the current department policy to present a written summary report, the review committee was reconvened in August 1976. This report reflects the staff consensus.

Commissioner was not fully informed of the evidence by the Department's review committee prior to rendering his decisions of September 15, 1975. We discern no prejudice to the borough, or denial to it of due process, by the procedure used. The borough was given ample opportunity to register its opposition to the applications. This it did in substantial detail.

Our review of the expanded record before us clearly discloses that the Commissioner's determinations are supported by sufficient credible evidence in the record, considering the proofs as a whole, with due regard to the Department's expertise in the area. *Mayflower Securities v. Bureau of Securities,* 64 *N. J.* 85, 92–93 (1973); *Parkview Village Assoc. v. Collingswood,* 62 *N. J.* 21, 34 (1972). We discern no reason or justification for disturbing them. *State v. Johnson,* 42 *N. J.* 146, 162 (1964). We find them to be entirely reasonable in the circumstances.

Finally, the borough claims that most of the land included in the applications is landlocked and accessible only by water and therefore not open to the public. It suggests that because of this, certification of its eligibility for real property tax exemption should have been disallowed. We disagree. The Staff Summary Report which was adopted by the Commissioner states that:

The property is currently a flood plain area known as Great Piece Meadows with the following uses: natural area, historic area, wildlife area, education, research and natural flood storage.

We are satisfied that, despite its limited accessibility, the land in question qualifies for public conservation uses and thus falls within the ambit of the Green Acres tax exemption legislation.

The determinations of the Commissioner of the Department of Environmental Protection under review are affirmed.