ETHEL KAUFFMAN, MICHAEL TEDESCHI, MARION POSWEN-CYK, ALEXCIS FRANCHINO, DORIS PLOCK, VINCENT FIETTI, JR. AND RAYMOND PASQUIN, PLAINTIFFS, AND STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, PLAINTIFF–INTERVENORS, v. THE MAYOR AND COUNCIL OF THE BOROUGH OF NORTH HALEDON, DEFENDANTS, AND GERALD WILSON AND ANDREA WILSON, DEFENDANT–INTERVENORS.

Superior Court of New Jersey
Law Division Passaic County

Decided July 25, 1988.

Samuel A. Wiener for plaintiffs.

George P. Cook for plaintiff-intervenors (W. Cary Edwards, Attorney General of New Jersey, attorney).

Thomas R. Raimondi for defendants (Diamond, Afflitto & Raimondi, attorneys).

Gene N. Schiffman for defendant-intervenors (Schiffman, Berger & Kaufman, attorneys).

SALERNO, J.S.C.

This is the matter of Ethel Kauffman and other plaintiffs against the Mayor and Council of the Borough of North Haledon in which the State of New Jersey was permitted to intervene as an additional plaintiff, and Gerald Wilson and Andrea Wilson were permitted to intervene as additional defendants.

There remains to be decided in this case the following issues:

1. Is the sale of Block 31, Lot 24 subject to the restrictions of the New Jersey Green Acres Land Acquisition and Recreation Opportunities Act, *N.J.S.A.* 13:8A–35 *et seq.*?

2. Is Ordinance No. 2–1986, adopted February 9, 1986 by the Borough of North Haledon rezoning Block 31, Lot 24 from open space to an RA–1 residential zone, a violation of the development project agreement between the Borough of North Haledon and the State of New Jersey Department of Environmental Protection (hereinafter NJDEP)?

3. Is the development project agreement of February 9, 1986 entered into between the parties North Haledon and NJDEP a valid and enforceable contract?

4. Was the development project agreement intended to serve only as an interim agreement between the parties and a memorialization of official notification of project approval to be superseded upon completion of the project by a Green Acres grant contract; and, if so, does the NJDEP's failure to execute the grant contract relieve the borough of any obligations remaining under the development project agreement?

5. Should the NJDEP's own procedures and conduct in this matter estop it from prohibiting the sale of Lot 24 to Wilson?

6. Is the sale of Block 31, Lot 24 on July 2, 1986 which was restricted to contiguous property owners valid and enforceable?

7. Does the fact that Block 31, Lot 24 is landlocked have any bearing on any of the other legal issues involved in this case?

8. If the sale by the borough of Lot 24 to Wilson violates either the Green Acres statute or the development project

agreement, what is the appropriate remedy when the borough has already contracted to sell and execute a deed to Wilson?

We will deal first with the Green Acres issues.

In adopting the New Jersey Green Acres Land Acquisition and Recreation Opportunities Act, *N.J.S.A.* 13:8A–35 *et seq.*, which we will refer to as the Green Acres act, the Legislature made certain findings in *N.J.S.A.* 13:8A–36 of which the following are pertinent:

The Legislature hereby finds that:

a. The provision of lands for public recreation and the conservation of natural resources promotes the public health, prosperity and general welfare and is a proper responsibility of government;

b. Lands now provided for such purposes will not be adequate to meet the needs of an expanding population in the years to come;

c. The expansion of population, while increasing the need for such lands, will continually diminish the supply and tend to increase the cost of public acquisition of lands available and appropriate for such purposes;

d. It is necessary to provide funds to assure that lands which have been, or which may hereafter be, acquired for recreation and conservation purposes can be developed to provide public recreation and conservation opportunities and to implement the New Jersey Statewide Comprehensive Outdoor Recreation Plan;

e. The State of New Jersey must act now to acquire and develop as well as to assist local units to acquire and develop substantial quantities of such lands as are now available and appropriate for such purposes so that they may be used and preserved for use for such purposes.

Thus, the State of New Jersey has made a long-range commitment to recreation and the conservation of natural resources in this State.

In the section of the Green Acres act devoted to definitions, *N.J.S.A.* 13:8A–37, the Legislature defined "recreation and conservation purposes" as follows under subparagraph (f).

f. "Recreation and conservation purposes" means the lands for parks, natural areas, historic areas, forests, camping, fishing, water reserves, wildlife, reservoirs, hunting, boating, winter sports and similar uses for either public outdoor recreation or conservation of natural resources, or both.

Natural areas and conservation of natural resources are clearly set forth, and thus, are expressly encompassed in the definition of recreation and conservation purposes.

■ The parcel of land which is the subject matter of this lawsuit is known as Lot 24 in Block 31 on North Haledon's tax map. It contains 28.67, more or less, acres and will be referred to in this opinion as the premises in question. The premises in question are landlocked, that is, the premises have no access to any public street.

North Haledon acquired title to the premises in question by a tax sale certificate foreclosure in 1952. North Haledon adopted Ordinance No. 8–1972 on October 11, 1972, which created an open space zone district into which the premises in question were placed. That ordinance characterizes the premises in question as "one of the most outstanding and beautiful natural areas remaining in the Borough of North Haledon and surrounding areas." The ordinance also pointed out the desire of the vast majority of the residents and of the mayor and council to preserve the premises in question in their natural state. In that ordinance the open space district is defined as follows:

Open space is any parcel or parcels of area of land or water which is characterized by natural scenic beauty or openness which is set aside, dedicated, designated or rural areas and as important physical, social, recreational, conservation, aesthetic and economic assets for the benefit, use and enjoyment of the public.

Ordinance No. 8–1972 prohibited any construction on the premises in question and said further:

No use shall be made of such district except the use to which said area was devoted at the time of the adoption of this Ordinance.

The court finds and concludes that the premises in question in the open space zone district, as well as its natural state condition as described in the ordinance, and as also described by the two expert witnesses, falls within the definition of recreation and conservation purposes under *N.J.S.A.* 13:8A–37. ·

Both the master plan of North Haledon of November 22, 1978 and the master plan reexamination of July 29, 1982 speak in favorable and recommendatory terms of the premises in question and its continued need as open space.

The Borough of North Haledon subsequently sought monies under the Green Acres act for the refurbishing of certain recreational facilities in the borough not connected with the premises in question. In pursuance of that objective, the borough, on October 13, 1982, adopted an enabling resolution authorizing the filing of a development grant request for Green Acres funds. The borough also submitted a development application.

Under date of February 9, 1983, the NJDEP and North Haledon entered into a development project agreement whereby North Haledon was to be awarded $37,500 in Green Acres funding for the purpose of refurbishing the existing football/soccer field or softball field in the borough. That development project agreement contained paragraph H(2) which reads as follows:

2. No other lands presently owned, dedicated or maintained for recreation or conservation purposes by Local Unit shall be diverted to a noncompatible use or disposal of without the approval of the Commissioner and the State House Commission.

For the purpose of identifying the property subject to that restriction, an open space inventory accompanied the application and the development project agreement listing those lands which were "owned, dedicated or maintained for recreation or conservation purposes" by North Haledon. The premises in question were listed on the open space part of the inventory at that time.

On February 19, 1986, North Haledon adopted Ordinance No. 2–1986 which changed the premises in question from the open space zone district to the RA–1 residential zone. Thereafter, on February 26, 1986, North Haledon adopted Resolution No. 72–1986, declaring that the premises in question were not needed for public use and authorizing said parcel to be sold at public auction to the highest bidder. On March 19, 1986, North Haledon conducted an auction to receive bids, at which time Andrew Cannella Roofing Co., Inc. was the highest bidder offering $530,000 for the property. On April 9, 1986, North

Haledon adopted Resolution No. 111–1986, rejecting Cannella's bid and authorizing a second sale. Resolution No. 112–1986, also passed on April 9, 1986, established the date of the new sale as April 30, 1986.

On April 30, 1986, a second public auction was held, at which time Frank Tondo was the only bidder, and he tendered a bid of $530,000, which was the minimum price fixed by that resolution. (Tondo was originally one of the parties in this suit, but subsequently withdrew.) On May 14, 1986, North Haledon considered a resolution approving the sale to Tondo and authorizing the execution of the contract, but that resolution was tabled. It was next taken up on May 28, 1986 when the Borough of North Haledon adopted Ordinance No. 9–1986 authorizing a private sale of the premises in question to contiguous landowners pursuant to *N.J.S.A.* 40A:12–13(b)(5). That ordinance was adopted on second reading on June 11, 1986. On July 2, 1986 a sale restricted to contiguous property owners was held, and Wilson was the highest bidder at $720,000. Resolutions were adopted on July 2, 1986, which rejected Tondo's bid and which approved the sale to Wilson. Subsequently a contract was executed.

On July 24, 1986, Kauffman filed a complaint in this action to set aside the sale to Wilson. Wilson intervened as a defendant-crossclaimant and obtained an order dated July 29, 1986 entered by our colleague, Judge Thomas Rumana, which permitted the sale to close in escrow. On August 1, 1986, Wilson and North Haledon executed that escrow agreement for the closing papers and the closing funds.

Thereafter, in December of 1986, the NJDEP was allowed to intervene as a plaintiff-intervenor.

A few additional fact findings are needed for this decision and are made as follows. After the Green Acres application and the development project agreement was executed and filed, accompanied by the inventory showing the premises in question as open space, and prior to the adoption of Ordinance No.

2-1986, rezoning the premises in question to a residential RA-1 zone, the Green Acres division of NJDEP delivered the sum of $24,600 to North Haledon by check number IT450385 dated April 17, 1985, which was accompanied by an invoice which said in pertinent part: "partial payment in accordance with the Project Agreement between the State of New Jersey and North Haledon." $24,000 is approximately two-thirds of the agreed Green Acres grant.

On or about December 11, 1985, the Mayor of North Haledon signed the Green Acres development grant contract. This contract was mailed to the Green Acres division by a letter of December 19, 1985.

By letter dated March 10, 1986, the borough mailed another open space inventory to the Green Acres division. That latter inventory omitted the premises in question from the open space portion of the inventory. This occurred because the borough clerk advised the borough engineer who was preparing the inventory, to remove the premises in question from the inventory, since the borough, in the interim, had adopted Ordinance No. 2-1986 which removed the premises in question from the open space zone district. That development grant contract was never signed by the State, nor did the State ever note or protest the removal of the premises in question from the inventory.

Was this inaction by the State the result of some affirmative conscious act by a responsible state official, or was it some bureaucratic inefficiency or inattentiveness? The evidence here does not provide the answer to that question. The court thus cannot, and will not, speculate as to what the answer might be.

As to the status of the premises in question, it has been argued that the landlocked status of the premises in question precludes its availability for conservation purposes.

An old mountain climber once was asked why he had spent an entire lifetime trying to conquer a certain peak. He replied simply, "because it's there."

Can not, then, a piece of natural land, though landlocked, still serve conservation purposes simply because it's there? Of course, a rhetorical question cannot be an answer to this legal problem. There is, however, a case, though not strictly on all fours with this case, nevertheless similar enough so that it can, by analogy, apply here.

In *Wildlife Preserves, Inc. v. Bor. of Lincoln Park*, 151 *N.J.Super.* 533 (App.Div.1977), a private wildlife group applied for a Green Acres tax exemption for premises it owned in Lincoln Park. The application was granted in part and denied in part. In the Appellate Division an issue was raised by the Borough of Lincoln Park as to the landlocked status of the exempted premises. The Appellate Division, in that regard, said:

> Finally, the Borough claims that most of the land included in the applications is landlocked and accessible only by water and therefore not open to the public. It suggests that because of this, certification of its eligibility for real estate tax exemption should have been disallowed. We disagree. The Staff summary Report, which was adopted by the Commissioner states that:
>
> The property is currently in a flood plain area known as Great Piece Meadows with the following uses: natural area, historic area, wildlife area, education, research and natural flood storage.
>
> We are satisfied that, despite its limited accessibility, the land in question qualifies for public conservation uses and thus falls within the ambit of the Green Acres tax exemption legislation. [*Id.* at 545]

Clearly then, from that decision, natural areas, though landlocked, can serve recreation and conservation purposes simply because those natural areas are there.

As stated earlier, the court concludes and finds that the premises in question is the zone of open space under the 1972 zone ordinance, as well as its natural state, as confirmed by the testimony of two conservation experts, falls squarely into the definition of recreational and conservational purposes under *N.J.S.A.* 13:8A–37. The Legislature, in the Green Acres act, sought to provide an increase in lands devoted to recreation and conservation purposes. This purpose and intent is clearly set forth in *N.J.S.A.* 13:8A–36(a), (b), (c), (d) and (e). To implement those salutary objectives and in order to prevent municipalities

from taking advantage of the program by acquiring new lands with Green Acres funds, while at the same time selling off previously owned properties at no net gain to the public, the Legislature enacted *N.J.S.A.* 13:8A–47 to guard against such abuses and to prevent municipalities from enriching their own coffers at the expense of the State treasury.

*N.J.S.A.* 13:8A–47(b) reads as follows:

b. A local unit which receives a grant under this act shall not dispose of or direct to a use for other than recreation or conservation purposes any lands held by such local unit for such purposes at the time of the receipt of said grant without the approval of the Commissioner and the State House Commission and following a public hearing by the local unit at least one month prior to such approvals.

■ The language of that statute is mandatory and would appear, the court concludes, to be self-implementing and not require any further administrative action by the NJDEP. Any lands held by a municipality for either recreation or conservation purposes at the time of Green Acres funding are made subject to this statutory restriction and cannot be sold or otherwise diverted from their existing use unless the statutory requirements have been met. The court concludes that the premises in question were, as stated before, held as a beautiful natural area at the time of the Green Acres funding. It was, as the court stated before, in the borough's own open space ordinance, one of the most outstanding and beautiful natural areas remaining in the Borough of North Haledon and surrounding communities. Furthermore, the definition of recreation and conservation purposes, as found in *N.J.S.A.* 13:8A–37(f), expressly includes natural area. There is then, in the court's view, no doubt that the premises in question is subject to the Green Acres restrictions regarding subsequent diversion or sale.

In addition to the mandate of *N.J.S.A.* 13:8A–47(b), the terms of the development project agreement, in particular, paragraph H(2), complement the statute and bar the diversion of non-Green Acres funded recreation or conservation lands to uses incompatible with recreation and conservation purposes.

■ Wilson and the borough argue that the borough and the State never officially entered into the later Green Acres development grant contract and never recorded such contract as required by Green Acres regulations. This is certainly all true as borne out by the evidence. Is that deficiency sufficient to free the premises in question for unrestricted development unencumbered by Green Acres restrictions? Put another way, even without a recorded Green Acres development grant contract, is there enough to sustain the Green Acres restrictions? For that answer we must look to the development project agreement of February 9, 1986 and probe its attributes, if any, as a complete and binding contract. The court concludes that that agreement has all of the elements of a valid and enforceable contract. It has mutual obligations and conditions; it specified consideration; it is signed by the representatives of both parties; and was reviewed and approved by North Haledon's attorney. The agreement clearly does not appear to be illegal or contrary to any public policy of the State, but rather appears to be pursuant to the broad powers which are prescribed for the commissioner with respect to the terms and conditions of grants. In addition, and perhaps more telling, the State paid out to the borough $24,600 which is approximately two-thirds of the entire grant pursuant to, and in accordance with, the terms of that development project agreement.

In *Bor. of Demarest v. State,* 148 *N.J.Super.* 322 (Ch.Div. 1977) Demarest had entered into two separate Green Acres agreements, each containing the paragraph H(2) restrictive language. In ruling that Demarest may not divert the premises which were the subject matter of the suit, Judge Gelman said: "Demarest freely and advisedly negotiated the two contracts which now bind them." *Id.* at 326.

The development project agreement was entered into by North Haledon freely and advisedly and it now binds North Haledon. Thus, North Haledon's Zoning Ordinance No. 2–1986 violates both *N.J.S.A.* 13:8A–47(b) and paragraph H(2) of the

development project agreement and is hereby declared void and set aside.

North Haledon is hereby restrained from holding, maintaining or using the premises in question for any purpose other than that as open space as defined in Ordinance No. 8–1972 unless and until North Haledon pursues, and successfully meets, the statutory conditions for the release of Green Acres restrictions.

The court adds parenthetically that the July 29, 1986 order in this case permitted an escrow closing between North Haledon and Wilson upon several conditions, one of which was paragraph 3.1:

3.1 The Borough obtaining the written approval of the Commissioner of the Department of Environmental Protection and the State House Commission to the Borough's sale of Lot 24 in Block 31, or the Borough otherwise satisfying all provisions of law including *N.J.S.A.* 13:8A–47 and the Green Acres Grant to sell Lot 24 in Block 31 without any encumbrance or restriction.

In the ensuing two years, apparently no action has been taken to accomplish those approvals.

■■ In this case, intervenor Wilson argues that the State should be estopped from restraining the sale of the premises in question to him. Wilson argues that because of the State's failure to execute and cause to be recorded the Green Acres development grant agreement, he had no notice of the State's Green Acres restrictions.

In New Jersey the doctrine of estoppel may not be asserted against a public body such as the State to the same degree or extent as it may be applied against a private party.

The Appellate Division said in *In re Allstate Insurance,* 179 *N.J.Super.* 581 (App.Div.1981):

Estoppel may be evoked against public bodies only to prevent manifest wrong and injustice and where it would not hinder or prejudice essential government functions. [at 593]

The New Jersey Supreme Court has also said that neither estoppel nor laches are applied against the State to the same extent as against private parties. *O'Neill v. State Highway*

*Dept.*, 50 *N.J.* 307, 319 (1967). Further in *Newark v. Natural Resource Coun. Dept. of Env. Prot.*, 82 *N.J.* 530 (1980), the Supreme Court said:

... the party seeking the benefit of the estoppel has the burden of establishing that an officer of the State, conscious of the State's true interest and aware of the private owner's misapprehension, stood by while the private owner acted in detrimental reliance. [at 545]

The equitable doctrine of estoppel also requires knowledge by the estopped party.

The court finds that the State has not in any way misrepresented or concealed any material fact from Wilson. There is no evidence that the State knowingly stood by, consciously or purposely, and let North Haledon and Wilson act in detrimental reliance on its actions.

Finally, and perhaps most important with respect to the doctrine of estoppel, that doctrine requires an element of detrimental or irretrievable change of position or harm to the party asserting the estoppel. The fact is, however, that the entire purchase price of $720,000 is safely deposited in an interest bearing escrow account which diminishes the claim of any harm which could be the basis for estoppel asserted by Wilson. The court concludes that estoppel may not be asserted by Wilson against the State.

■ Finally, we consider the allegations that North Haledon had no legal authority to restrict the sale of the premises in question to only contiguous landowners under *N.J.S.A.* 40A:12–13. That statute in pertinent part reads as follows:

Any municipality may sell any real property not needed for public use other than municipal lands otherwise dedicated or restricted pursuant to law. and all such sales shall be made by one of the following methods:

(b) At private sale, when authorized by ordinance, in the case of a municipality, in the following cases:

(5) A sale to the owner of the real property contiguous to the real property being sold provided that the property being sold is less than the minimum size required for development under the municipal zoning ordinance.

It may be argued, and indeed the State has so argued, that the premises in question is "otherwise dedicated or restricted

pursuant to law." That is, the State says that the premises in question may not in any event be sold because of the existing Green Acres restrictions. This argument raises the doctrine of judicial economy, that is, that a court should limit its judicial decision making power to actual disputes only and not indulge in hypothetical or advisory opinions. In this case, however, the validity of the sale under *N.J.S.A.* 40A:12–13, restricted only to contiguous owners, has been fully litigated, briefed and argued, and the parties, the court believes, are entitled to a decision on that issue to guide any future unrestricted sale.

Only May 28, 1986, North Haledon adopted Ordinance No. 9–1986 authorizing a private sale of the premises in question to contiguous landowners pursuant to the latter statute. That sale was held and Wilson, as a contiguous landowner, was the successful bidder. It is the theory of the borough and of Wilson that the premises in question is "less than the minimum size required for development under the Municipal Zoning Ordinance" because it is landlocked and has no frontage on or access to an established public street. The court then must decide what is meant by "less than the minimum size required for development under the Municipal Zoning Ordinance," and do the premises in question, being landlocked, fall into that category.

It is helpful first to look at the key words "minimum size." *Webster's New Collegiate Dictionary* defines "minimum" as:

> The least quantity assignable, admissible or possible; the least of a set of numbers. [at ——]

That dictionary describes and defines the word "size" as follows:

> Physical magnitude, extent or bulk; relative or proportionate dimensions; relative aggregate amount or number. [at ——]

From the English meanings of those words, the court concludes that the words "minimum size" used in the statute convey a meaning or meanings in a dimensional or configurational context.

The court obtained, through the kind assistance of Nora N. Crawford, the Law Librarian of the New Jersey State Library in Trenton, the Senate committee statement regarding this section of the statute. Dealing with the private sale to contiguous property owners of property "less than minimum size required for a development under the Municipal Zoning Ordinance," the committee report says in part:

Such private sale shall be made in the owner or owners of the property or properties contiguous to the undersized or substandard plot.

The court repeats and emphasizes the words "undersized or substandard plots" in that legislative history. This meaning or intent related to undersized or substandard property is a dimensional or small or a deficiently configured lot which cannot be built upon under municipal zoning ordinances.

A recent case seems to illustrate those conditions to which the statute was intended to apply. In *Englander v. West Orange Tp.*, 224 *N.J.Super.* 182 (App.Div.1988) two contiguous landowners attacked a sale to a non-contiguous third party of a parcel of land located between the properties of the two contiguous owners. The lot at issue had a frontage of 50 feet and an area of 6,000 square feet. While the case also contained issues related to a neighborhood scheme of restrictions, dedication and vacation of streets, the court did say:

Most significantly in the context of this case, *N.J.S.A.* 40A:12–13.2 requires that whenever a municipality intends to sell property which is less than the minimum size required for development under the Municipal Zoning Ordinance and the property contains no capital improvements, it must accord contiguous owners of the land the right to prior refusal to purchase the property. [*Id.* at 190]

This court concludes that the fact pattern in *Englander* illustrates that which the statute was intended to cover. The premises in North Haledon containing 28.67 acres does not, by reason of minimum size, fail to qualify for development.

Finally, to say that a 28.67–acre tract of land, because it is presently landlocked, is less than the minimum size required for development, in this court's view, flies in the face of common sense and any concept of fair and reasonable statutory interpre-

tation. The court, therefore, concludes that the sale to Wilson, pursuant to *N.J.S.A.* 40A:12–13(b)(5), was legally impermissible and void, and is hereby set aside.

Wilson is entitled to the return of the monies held in escrow plus all of the interest accrued thereon.