51 N.J. Super. 572 (1958)
144 A.2d 385
CHARLES A. BRACE, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT,
v.
CUNNINGSTON D. BLACK AND IVA D. BLACK, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS,
v.
FAYTHE R. BLACK AND MARION S. BLACK, INDIVIDUALLY AND AS EXECUTRICES OF THE ESTATE OF LEO H. BLACK, THIRD-PARTY DEFENDANTS,
v.
DOROTHY DAVENPORT (NEE DOROTHY BLACK), MARION R. ALMQUIST (NEE MARION R. BLACK) AND LEO FRANCIS BLACK, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 2, 1958.
Decided August 7, 1958.
*573 Before Judges STANTON, HALL and GAULKIN.
*574 Mr. Frank G. Schlosser argued the cause for the plaintiff-appellant (Messrs. Mackerley and Friedman, attorneys; Mr. William J. McGovern on the brief).
Mr. Francis E. Bright argued the cause for the defendants-respondents (Messrs. Dolan and Dolan, attorneys).
Mr. Frederic G. Weber argued the cause for the third-party defendant, Faythe R. Black (Messrs. Van Blarcom, Silverman & Weber, attorneys; Mr. Albert G. Silverman on the brief).
The opinion of the court was delivered by STANTON, S.J.A.D.
The plaintiff brought this action for partition, accounting and incidental relief against Cunningston D. Black, hereinafter referred to as C.D., and his wife. He alleged that he had title to an undivided seven-ninths interest in the lands described in the complaint by virtue of conveyances made to him by the widow and children of Leo H. Black. The defendants challenged the plaintiff's title and alleged that C.D. had an option to purchase the lands under an agreement dated November 1, 1934 which will be discussed later and also a contract with the executrices under the will of Leo H. for the purchase of said lands, and that the plaintiff took his legal title subject to the rights of C.D. under these agreements. The defendants demanded that the plaintiff and his wife convey the lands to them upon the payment of seven-ninths of the option price and in the alternative that they convey the same upon the payment of the contract price to the executrices under the will of Leo H. There were other demands for relief which need not be detailed here.
The defendants filed a third-party complaint against Faythe R. Black and Marion S. Black, individually and as executrices of the estate of Leo H. In it is expressed the right of C.D. to a conveyance of the lands under the agreement of November 1, 1934, but in the event of his failure to obtain it he demanded specific performance of his contract with them or in the alternative damages of $30,000 *575 from Faythe individually. Thereafter Faythe, individually and as executrix as aforesaid filed a third-party complaint against her two children and her stepdaughter, who were the only children of her deceased husband Leo H., in which she sought exoneration from any judgment that might be entered against her in favor of C.D. and his wife, and an accounting by her stepdaughter Dorothy of any money she received under the April 1, 1951 contract. Several crossclaims and counterclaims were filed which need not be discussed here, and the matter came to pretrial conference, at which an order was entered which provided, inter alia, for the filing of further pleadings. Later there was a supplemental pretrial conference at which an order was entered setting forth the rival contentions and all the issues in the case. Provision for the further amendment of certain pleadings was made at this conference.
In the supplemental pretrial order we find this provision:
"It is suggested that the validity of the option and contract held by Cunningston D. Black should be determined first at the trial and that the evidence bearing on this question should be offered by both sides so that this matter can be disposed of prior to the determination of the other issues in the case."
At the end of the three day trial, an oral decision was given by the court on the three issues that were tried. The other issues were reserved. At the time of the rendition of this decision it was apparently thought by counsel that it might lead to a settlement of the other issues and thereby bring the entire controversy to an end. However, things did not work out that way and about nine months later judgment was entered upon the court's conclusions. It was determined therein that the so-called option agreement of November 1, 1934 was invalid and unenforcible; that the deed of Faythe to C.D. and his wife dated January 11, 1947 was a valid conveyance; and that the defendants were entitled to the specific performance of the contract of April 1, 1951. The judgment declared that the defendants held an undivided two-ninths interest in the premises by virtue of *576 the conveyance from Faythe and that they were entitled to a conveyance by the surviving executrix of Leo H. of the remaining undivided seven-ninths interest. The judgment reserved for future disposition all the remaining issues in the case following the completion of the proofs.
The plaintiff appealed from the judgment but his argument is directed only against the determination as to the validity and specific performance of the contract of sale. C.D. and his wife cross-appealed from that part of the judgment respecting the so-called option in the agreement of November 1, 1934.
Some underlying facts which are not in dispute perhaps should be set forth here for background purposes. Alice W. Black died seized of two farms in 1914. She was survived by 11 children. In her will she devised her farms to three sons, Colin, Leo H. and Frank. She bequeathed the sum of $700 to each of the other children and charged the farm known as the homestead farm with the payment of the same. The will acknowledged that all of the personal property, farm utensils, farming implements and machinery, as well as the live stock on the farm, belonged to the three sons to whom she devised the farms. It appeared that these sons were working the farms at the time of her death and that Frank and Leo H. continued to do so down to the time of the death of Frank, intestate and unmarried, on September 9, 1933. He was survived by eight brothers and sisters. His brother George and sister Alice predeceased him, intestate and without issue. Some time prior to Frank's death Colin had left the farms and sold his interest therein to Leo H. and Frank. Although there was no deed to evidence the transfer of title, all parties in this action concede that to be the fact and it was accepted as such at the time of Frank's death by Colin. C.D. was appointed administrator of Frank's estate. In connection with the settlement of his estate the November 1, 1934 agreement mentioned above was entered into. The parties to this were as follows: C.D. as administrator of the estate of Frank, party of the first part; Leo H., party of the second part; Colin, party of *577 the third part; the eight surviving brothers and sisters of Frank, parties of the fourth part. The agreement recites that Frank and Leo were engaged in the farming business, that at the time of Frank's death he and Leo had certain obligations in connection with the said business, and that the agreement was entered into to settle his estate and the partnership business conducted by him and Leo. There are many promises and undertakings by each of the parties, some of which need not be mentioned here. It should be noted that C.D. as administrator was to pay out of the proceeds of insurance policies on the life of Frank in the sum of $6,000 the following: $2,500 note of Frank held by a bank, and all indebtedness, taxes, funeral expenses, and legal and administration expenses in connection with the settlement of Frank's estate. He was to deliver to Leo H. a bill of sale for all the right, title and interest of Frank in all personal property situate on the farms operated by Leo H. and Frank at the time of the latter's death. Colin by the agreement was required among other things to execute and deliver all necessary instruments for the transfer to Leo H. of any interest he had in the personal property on the farms aforesaid and to execute and deliver to Leo H. and his sister Marion such deeds as may be necessary to transfer to each of them that portion of the farms which were to be conveyed to them by the terms of the agreement. The parties of the fourth part were to execute and deliver to Leo H. a deed for the farm known as the Black Homestead and that part of the Westbrook farm which is known as the island lands, together with certain water rights in the other part, and to convey to Marion the remaining part of the Westbrook farm subject to the water rights above mentioned. Leo H. agreed among other things to pay all the outstanding indebtedness of the partnership business and he gave what has been referred to in this case by some of the parties as the option, in the following language:
"5. If at any time hereafter he, or his heirs, decide to sell the said Black Homestead Farm, or such portion of the Westbrook Farm as is to be conveyed to him under the terms of this agreement, he will *578 for a period of six months prior to such sale, give to the parties of the fourth part in this agreement, or their survivors, the right and option to purchase said premises at the sum of Six Thousand Five Hundred Dollars ($6,500.00); said purchase to be paid one-half in cash and the balance by executing a purchase money mortgage for a period of at least three years with interest at the then prevailing rate.
It is the intention of the parties that this option shall be binding upon the heirs, executors, administrators and assigns of Leo Black, and is to be exercised primarily by the survivors of the parties of the fourth part. If the parties of the fourth part cannot agree as to the purchaser or purchasers, then this option shall be successively available first, to a majority of the survivors of the parties of the fourth part; second, to Colin Black; and third, to the individual survivors of the parties of the fourth part in the order of seniority.
This option shall expire with the death of the last survivor of the parties hereto.
The said Leo Black and Faythe Black, his wife, will execute an agreement contemporaneous herewith granting the above option to the parties of the fourth part hereto."
It might be noted here that Leo and his wife Faythe did not execute the agreement which was apparently intended to implement the foregoing.
It would appear that the estate of Frank was settled in accordance with the above agreement. Appropriate deeds were executed and delivered to Leo H. so that he became seized of the entire fee in the homestead farm and in the island part of the Westbrook farm. These two properties are the lands described in the complaint and as to which the plaintiff seeks partition.
Leo H. died on January 21, 1936, leaving his widow Faythe, his daughter Dorothy of a prior marriage and who is now Davenport, and two children of his marriage with Faythe, Marion now Almquist, and Leo F. He named his widow and his sister Marion as executrices of his will and they both qualified. After providing for the payment of his debts and disposing of certain personal property he bequeathed and devised to his widow and two daughters the residue of his estate. The executrices were given a naked power of sale. The will is dated March 21, 1934 and the testator's son Leo F. was born after this date. Inasmuch as he was not provided for by settlement nor disinherited by his father, *579 he became entitled to the same share as if his father had died intestate. Comp. Stat. (1910), p. 5865, § 21. Consequently upon the death of Leo H., title to the premises in question became vested as follows: an undivided two-ninths interest in each of Faythe, Dorothy and Marion, and an undivided three-ninths interest in Leo F.
On May 19, 1938, the premises in question were leased to C.D. for a period of five years with an option to renew for a like period. He has been in continuous possession from the time of the making of the said lease. By deed dated January 11, 1947 Faythe conveyed to C.D. and his wife her undivided two-ninths interest in the premises.
On April 1, 1951 Faythe and Marion as executrices of the estate of Leo H. entered into a contract with C.D. for the sale to him of the premises in question. The details of this agreement will be discussed later but it might be noted here that the agreement covers the entire premises and not a fractional part thereof.
While there is conflict in the testimony concerning it, we are satisfied that for many years prior to 1951 C.D. was anxious to acquire title to the premises. It likewise appears that Faythe was desirous of disposing of the interests of herself and her two children therein at market value. All the parties are in agreement that the so-called option in the agreement of November 1, 1934 was a cloud on the title and was an obstacle to a sale. The proofs show that Faythe was determined not to sell on the basis of the $6,500 figure set forth in the so called option, although she was anxious to liquidate the interests of herself and her children for the purpose of furthering their education. It is to be noted that C.D. leased from Marion on May 20, 1938 the part of the Westbrook farm which she acquired under the 1934 settlement and he purchased the same from her in April, 1948. So it appears that since May 1938 he has been in continuous possession of the two farms of which his mother died seized. No other member of the Black family so far as the record discloses evidenced any interest in acquiring the lands except Dorothy Davenport and her *580 husband but they were not parties to the preemption agreement.
The plaintiff obtained his interest in the premises by virtue of the following: (a) deed by Dorothy Davenport et vir, and Marion R. Almquist et vir, and Faythe Black, widow, dated January 14, 1955; (b) deed by Faythe as guardian of Leo F., a minor, dated January 14, 1955; (c) deed by Leo F., unmarried, dated February 9, 1956. The last deed was given by Leo F. after he became 21 years of age to confirm title in the plaintiff of the undivided one-third interest which he inherited in the property; this was done as the result of a question raised as to the validity of the deed given by his guardian.
The first matter to be considered is the validity of the so called option, which is really a mere right of refusal or right of preemption. The court below held that the agreement was too vague and indefinite to be enforcible and that it was an unreasonable limitation on alienability.
Restatement, Property, § 413(2), states:
"A promissory restraint or forfeiture restraint on the alienation of a legal estate in land which is in the form of a provision
(a) that the owner of the estate shall not sell the same without first offering to sell to some designated person, either at a fixed price, or at a percentage of the price offered by another person, * * *
is valid if, and only if, the restraint is valid under the rules stated in §§ 406-411."
Section 404 thereof defines a promissory restraint on alienation as an attempt by an otherwise effective conveyance or contract to cause a later conveyance to impose contractual liability on the one who makes the later conveyance when such liability results from a breach of an agreement not to convey.
There is in the law a well-recognized policy of freedom of alienation of property. This is so imbedded that restraints on alienation must be in some way justified in order to be upheld. In the Restatement under § 413, at page 2442, we find this illustration:
*581 "A, owning Blackacre in fee simple absolute makes an otherwise effective conveyance thereof `to B and his heirs, and B covenants for himself, his heirs, executors and assigns, that, if C is still alive, he will not sell Blackacre without first offering Blackacre to C for $5,000.' C is in being at the time of the conveyance. The promissory restraint is invalid."
In the comment under § 413, 2(a), we find the following at page 2444:
"When, by the terms of the restraint, the price at which the estate must be offered to the designated person is fixed or is to be a certain percentage of a third party's offer, there is substantial curtailment of the alienability of the land. A fixed price is usually set sufficiently low, in the light of possible developments, to enable the designated person to reap the benefits of any increase in value. The use of the percentage form assures the designated person of definite profit without need to speculate on future possibilities. In either case, the owner of the estate will be deterred from attempting to sell his property because of the improbability that he will realize the full market value. This hindrance to alienation brings these provisions within the rules previously stated in §§ 406-411."
Restatement, Property, § 406, declares that a restraint on the alienation of a legal possessory estate in fee simple which is, or but for the restraint would be, indefeasible is valid if, and only if, among other things the restraint is reasonable under the circumstances.
In a comment upon reasonableness under the foregoing section, at page 2407, various factors are set forth which might tend to support the reasonableness or unreasonableness of a restraint. It is pointed out that these factors are not exhaustive and that "each case must be thoroughly examined in the light of all the circumstances to determine whether the objective sought to be accomplished by the restraint is worth attaining at the cost of interfering with the freedom of alienation or to determine whether the particular interference with alienability is so slight as not to be material."
"Restraints against alienation are not favored at law, but on the contrary there is a strong public policy in favor of the free transferability of property; and restraints thereon have been characterized as obnoxious to public policy and void." 73 C.J.S. Property § 13, p. 195.
*582 "All restraints on alienation run counter to the policy of freedom of alienation so that to be upheld they must in some way be justified." Restatement, Property, § 405, comment.
With respect to the policy of the law in favor of freedom of alienation see Wrubel Realty Corp. v. Wrubel, 138 N.J. Eq. 466 (Ch. 1946); Krueger v. Frederick, 88 N.J. Eq. 258 (Ch. 1917).
In the somewhat analogous situation where cotenants agree to refrain from the exercise of their absolute right of partition, it has been held that such an agreement to be valid must be reasonable. See Michalski v. Michalski, 50 N.J. Super. 454, 460 (App. Div. 1958), certification denied 27 N.J. 278 (1958); Roberts v. Jones, 307 Mass. 504, 30 N.E.2d 392, 132 A.L.R. 663 (Sup. Jud. Ct. 1940).
In the situation presented in this case there has been no adequate showing of the purpose that the restraint on alienation was to serve. C.D. made a feeble attempt to prove that Leo H. in the 1934 settlement got more than his share and that the preemptive right was in lieu of his giving to his siblings a mortgage to secure the payment of $6,500. It was C.D.'s contention that the property was worth about $13,000 at the time and that under the settlement Leo H. was entitled only to $6,500. This lacks conviction when we consider that Leo H. then had legal title to one-third of the farms and an admitted equitable one-half interest in the undivided one-third interest which still remained of record in the name of his brother Colin; thus he had in reality an undivided one-half interest in both farms at the time of Frank's death. In addition to his undertakings as mentioned above in the settlement of Frank's estate, he agreed to pay all taxes assessed against both farms and to join in the transfer to his sister Margaret of moneys on deposit in two banks in the name of himself, Frank and Colin, and also to pay his sister Margaret the sum of $100 annually. Leo H. inherited a one-sixteenth interest in the farm property on the death of Frank. As a result he had a nine-sixteenths interest. As stated above he joined with his siblings in conveying to his sister Marion a substantial *583 part of the Westbrook farm now owned by C.D. While the record does not show how the eight siblings evaluated the properties involved in the adjustments made among them, what does appear makes it hardly likely that the balance was such that Leo's equity which was nine-sixteenths in both farms was reduced to one-half in one farm and part of the other. That is the proposition that C.D. is contending for. On the other hand, the contrary explanation at the trial that the purpose of the restraint was to keep the farms in the Black family carries more conviction.
The preemption provision included Leo H. himself among the eight persons who had rights under it. The right ran to all of them or their survivors and it was stated that the right was "to be exercised primarily by the survivors" of them. What is meant by this clause is not at all clear. How the various "options" were to be exercised likewise is not clear. The record would indicate that C.D. was the only one ever interested in asserting the preemptive right. Under it the eight siblings were to agree upon a purchaser in the event that Leo H. or his heirs decided to sell and if they could not agree then the provision stated that the "option" should be exclusively available first to the majority of the survivors of the eight siblings, then to Colin, and finally to the individual survivors of them in the order of seniority. No explanation has been made as to the reason for the order and priority of the parties in the exercise of the right in question. The period of time during which the preemptive right was to continue in effect was at the time of its creation likely to be a long one. It continues until the death of the last of the eight. At the time of the trial three of them were alive; now after the passage of 24 years there are two.
At to the value of the premises, there was testimony at the trial that it was $13,000 in 1934. Faythe conveyed an undivided two-ninths interest to C.D. in January 1947 for $2,200. This would indicate a value of at least $10,000 for the entire fee. However, Faythe testified that at the time of this conveyance she estimated the value of the property *584 at $20,000. When asked why she sold the two-ninths interest at the price aforesaid, she said:
"I sold my share to Mr. Black for the said price because I needed money to send my boy to school. He didn't have enough money to finance his college and education, therefore, Mr. Black was always holding over me `No matter who you sell the farm to you can still only get the sixty-five hundred and if you sell to someone else I personally am going to sue you.' And that has been going on over the last twenty years, holding that sixty-five hundred over my head, saying that was all he is entitled to pay and he was the only one to get it."
In the agreement of sale which C.D. is seeking to enforce, the stated consideration for the entire fee is $15,000. Albert Davenport testified that in the spring of 1950 at a so-called auction in the office of counsel for one of the interested parties which was probably a conference to discuss the possibilities of settlement, he offered $17,000 for the property. And it would appear now that despite the $15,000 provision in the April 1, 1951 contract, C.D. tried and by his counterclaim herein is still trying to acquire the property for $6,500 through the exercise of the so-called option.
Under all the circumstances of this case we are of the opinion that the preemptive provision here is an unreasonable and an unjustified restraint on alienation.
We now come to the contention that the action of the executrices of Leo H. in contracting to sell the premises to C.D. in April 1951 was ultra vires. Here was the exercise of a naked power of sale 15 years after the death of the testator. The general rule is that the passage of time alone does not invalidate the exercise of a power of sale; Hatt v. Rich, 59 N.J. Eq. 492 (Ch. 1900); Foley v. Devine, 95 N.J. Eq. 473 (Ch. 1924); Fidelity-Philadelphia Trust Co. v. Harloff, 133 N.J. Eq. 44, 59 (Ch. 1943); Sigmon v. Sigmon, 137 N.J. Eq. 469 (Ch. 1946).
It is generally held that since an unlimited power of sale is a restraint on alienation contrary to the interest of the devisee, the power is to be deemed paramount to the devisee's interest only to the extent that there appear testamentary *585 objects and purposes in aid of which the testator intended the power to be used. The power may be validly exercised only to enable and assist the executor to carry out the duties imposed on him by the will. The intent of the testator as ascertained from a consideration of the entire will and the surrounding circumstances is controlling. Foley v. Devine, supra; cf. Brearley v. Brearley, 9 N.J. Eq. 21, 34 (Ch. 1852); Moores v. Moores, 41 N.J.L. 440 (Sup. Ct. 1879).
In Maddock v. Progressive Investment Co., 79 N.J. Eq. 139 (Ch. 1911), where all debts and legacies had been paid and nothing remained for the personal representatives to do, the power of sale was held after six years to have been exhausted. Specific performance of contract of sale was refused.
In Foley v. Devine, supra, an action by executors for the specific performance of a contract for the sale of real estate, it was held that they had the right to exercise the power of sale 12 years after the death of the testator although all debts and legacies had been paid. It was said there that the exercise of the power was justified for the purpose of providing funds to defray the expenses of a judicial accounting and to compensate the fiduciary.
In our case it appears that nothing remained for the executrices to do in order to carry out the expressed or implied intentions of the testator. It has been said that an executor with a naked power of sale may sell where he conceives it to be for the convenience of the residuary devisees that they receive their shares of the residuary realty in cash and not in undivided shares in realty. Clapp, 6 N.J. Pract., § 555. Be this as it may, it has no applicability under the circumstances of this case. An examination of the contract in this case makes it clear that it was hardly intended thereby to convert the real estate into cash within a reasonable time for the convenience of the devisees and early payment to them. The following provisions in the contract should be noted: (a) The time for closing was fixed as April 1, 1961, which is ten years after the date of the *586 contract. This does not indicate that the executrices were liquidating the realty for the purpose of settling the estate and making convenient cash payment to the devisees. (b) It contains a clause wherein the executrices acknowledge that C.D. has an option to buy the property for $6,500 "provided he purchases the property with Marion S. Black. The said Marion S. Black by signing this contract consents to the purchase of the property by the said Cunningston D. Black and consents to perform the option agreement which she has previously agreed to exercise with the said Cunningston D. Black in the event it should become necessary to make it possible for the said purchaser to buy the property." Just what does this mean? Is it a step toward facilitating the sale of the property, or is it a road block set up by C.D. to delay it? (c) It provides that the contract shall be closed within six months after the time that the sellers can deliver good title "it being understood that by virtue of the option agreement the ability of the sellers to convey the property has been questioned." The meaning of this is dubious. If as C.D. now contends the purpose of this was to show that he and Marion as two of the three survivors who had a right to exercise the "option" were in effect exercising it, then the cloud of that "option" was removed and he was in position to get good title, but it appears that he had taken no step to acquire title under this contract until the present action for partition was brought against him. (d) By a clause in the contract the executrices recognize that C.D. is making permanent improvements and repairs to the buildings and the land and they agree that if for any reason the premises cannot be conveyed to the purchaser then he "shall be entitled to a lease upon the premises to run for the period that the value of the improvements and repairs entitles the purchaser to have a lease; said lease to be based for the purposes of this agreement on a rental of $900 per year and credit to be given against the rent for the amount of the improvements made by the purchaser in reliance upon this agreement of sale." This provision would permit the purchaser to make improvements *587 and repairs without limit as to kind or cost and it purports to entitle him to a lease to run for a period that would be limited only by the value of the improvements and repairs. Is this a step in the direction of liquidation and distribution among the heirs? (e) The agreement contains an acknowledgment that C.D. had already made improvements to the value of $3,000 for which he shall be entitled to credit upon the lease aforesaid. (f) It contains a clause that C.D. may pay directly to Dorothy Davenport any amounts that may be "paid hereunder by reason of the interest of Dorothy W. Davenport." It is noted that she took an undivided two-ninths interest in the property under her father's will. This provision in the contract means that C.D. may pay her directly the ratable part of the moneys that he has contracted to pay the executrices under the contract. (g) Another provision is that C.D. may retain any amount that he is required to pay under this contract which may be "attributable to his interest in the premises." It is noted that the contract is for the sale of the entire premises. This provision is a recognition of his undivided two-ninths interest therein acquired from Faythe in 1947. It is unusual to say the least. (h) There was no down-payment, but the contract provides that the consideration is to be paid at the rate of $90 a month, of which sum the executrices are to receive five-ninths and the remaining four-ninths are to be paid as above. By this is obviously meant that the executrices are to receive only $50 monthly, Dorothy Davenport $20, and C.D. is to retain for himself $20 monthly. (i) C.D. is permitted to take possession of the premises and take the rents, issues and profits therefrom although the payment of the purchase price extended over a period of ten years and although the agreement makes no provision for the payment of interest on the unpaid part of the purchase price. It should be added however that he did undertake to pay the taxes on the property as well as fire insurance premiums.
The mere recital of the foregoing provisions of the contract makes it obvious that it is not a step toward *588 liquidation and by it would be accomplished no purpose or intention of the testator. Clearly such a contract entered into 15 years after the death of the testator and under the circumstances of this case is not a proper and valid exercise of the power. Thus, if it be conceded that the power had not spent itself, nevertheless this exercise under all the circumstances of the case was ultra vires.
The judgment below in so far as it adjudged the agreement of November 1, 1934 invalid and unenforcible is affirmed; and in so far as it adjudged that C.D. and his wife were seized of an undivided two-ninths interest in the premises in question it is likewise affirmed. The judgment in all other respects is reversed. The matter is remanded for the purpose of disposing of the remaining issues in a manner not inconsistent with this opinion. Costs to the plaintiff.