584 A.2d 784

CEDAR COVE, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, AND THE STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, PLAINTIFF–INTERVENOR–RESPONDENT, v. ALPHONSE STANZIONE AND BOROUGH OF SOUTH TOMS RIVER, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS–RESPONDENTS, AND PLANNING BOARD OF THE BOROUGH OF SOUTH TOMS RIVER, DEFENDANTS.

Argued September 11, 1990—Decided January 29, 1991.

204

*Theodore E. Kyles, Jr.,* argued the cause for appellant.

*Mary C. Jacobson,* Deputy Attorney General, argued the cause for intervenor-respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

*Cràig L. Wellerson,* argued the cause for respondent Borough of South Toms River, etc. (*Dasti & Murphy,* attorneys).

*Bruce Dickstein,* argued the cause for respondent Alphonse Stanzione (*Kimmelman, Wolff & Samson,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

The Green Acres Land Acquisition and Recreation Opportunities Act of 1975 ("1975 Act" or "1975 Green Acres Act") was the third in a sequence of statutes designed to provide State funding to assist municipalities with the acquisition and development of property for conservation and recreation. The two predecessors of the 1975 Act, the Green Acres Land Acquisition Acts of 1961 and 1971, each restricted the alienability of those properties that municipalities acquired with the assistance of State funds by requiring approvals at the State level before any future sale. The 1975 Act imposed an additional restriction on the alienability of conservation or recreational properties. It required State-level approval of the sale not only of properties acquired with State funds but of all conservation or recreational properties that were owned by the municipality at the time it received any Green Acres grant, even if such properties had not been acquired or developed with Green Acres funds. In this case, the Court must determine what municipal properties, not acquired or developed with Green Acres funds, should be deemed held for conservation and recreational uses within the meaning of this restriction of the 1975 Green Acres Act.

The issue arises in the following setting. In late 1984, the borough council of South Toms River determined to offer for sale a parcel of land abutting the Toms River and known as Mathis Plaza. The council passed a resolution to conduct a public auction of the property. Notices of the auction and specifications of bids, including a bid minimum of $330,000, were published in area newspapers in early December 1984. At the auction, respondent Alphonse Stanzione was the only bidder; he submitted an offer of $330,000, which was accepted by the borough.

Subsequently, plaintiff, Cedar Cove, Inc., a corporation doing business in South Toms River and the owner of property adjacent to Mathis Plaza, filed an action challenging the validity of the borough's agreement to sell the property, naming as defendants the borough, its planning board, and Stanzione. The Department of Environmental Protection ("DEP") was permitted to intervene as a party plaintiff. Cedar Cove, which had submitted an untimely bid after Stanzione's bid had already been accepted, principally alleged that the auction had been procedurally defective, that it had violated the State statute governing municipal land sales (*N.J.S.A.* 40A:12–13), and that the sale process had been tainted by conflicts of interest. It also alleged that Mathis Plaza was used for recreational purposes and that the borough had not complied with the statutory restriction of the 1975 Green Acres Act requiring State approvals prior to sale of properties "held by" a municipality for recreational or conservation purposes.

Ultimately, the Law Division found in favor of defendants on all grounds except one: it determined that Mathis Plaza was subject to the restriction of the 1975 Green Acres Act. On appeal, the Appellate Division reversed that determination. 233 *N.J.Super.* 336, 558 *A.*2d 1351 (1989). We granted certification, 117 *N.J.* 647, 569 *A.*2d 1344 (1989), limited to the issue of the proper construction of *N.J.S.A.* 13:8A–47b as applied to the sale of public lands in this case.

## I.

The central issue is whether South Toms River was prohibited from selling Mathis Plaza to respondent Stanzione without State-level approvals because Mathis Plaza was, in the terms of the 1975 Green Acres Act, *N.J.S.A.* 13:8A–47b, "held by [South Toms River] for [recreational and conservation] purposes at the time of receipt of [a 1978] grant." This issue arises because the borough, in 1977, applied for $27,500 in Green Acres funds to develop a ballfield on land it already owned. The grant was received in 1978. At the time it applied for and received this Green Acres grant, the municipality owned the Mathis Plaza property. The borough, as noted, undertook to sell Mathis Plaza in 1984 without obtaining State approval.

The record discloses that Mathis Plaza was created from fill dredged from a channel in the Toms River by the Army Corps of Engineers in 1927. As early as 1928, the borough authorized improvements to the property, apparently to facilitate its use as a public park. However, the borough did not acquire title to Mathis Plaza until 1935, when it purchased the property from the State for $10,000. The State deed contained no restrictions on the property's use. Mathis Plaza now comprises Lots 1, 2, 3, and 4 of Block 3, Borough of South Toms River. Lots 2 and 4 have long been leased for commercial purposes and are currently occupied by a gas station and retail glass store. These lots are concededly not held for recreational or conservation purposes and thus are not subject to the restrictions of *N.J.S.A.* 13:8A–47b.

The matter is considerably less clear with respect to the remaining portions of the property, Lots 1 and 3, the sale of which would be subject to State approvals only if they were held by the borough for recreational and conservation purposes at the time of the 1978 Green Acres grant. The record reflects numerous instances of the use of those lots as a public park and recreational facility, undertaken with the approval and support of the borough over a forty-year period, from the purchase of

Mathis Plaza in 1935 through the time of the Green Acres grant in 1978. Area residents used the piers at Mathis Plaza for fishing, and the borough rented docking facilities for boats. For a time, there was a war memorial on Lot 3, and the area was used for Memorial Day services, as well as for circuses or carnivals in connection with fund-raising activities for borough services. The borough provided street lights and sanitation services to the site. The borough also installed benches, tables, and grills for picnicking at the site, although it appears that some of those facilities were not provided until after the borough's 1978 acceptance of Green Acres funds.

In addition to the facts indicative of the authorized and actual recreational use of the property, there was significant evidence that the borough was also interested in the commercial development of Mathis Plaza and its potential as a source of revenue. As mentioned, from the borough's purchase of Mathis Plaza or shortly thereafter, Lots 2 and 4 were used for commercial purposes. The borough council from time to time in the 1960s and 1970s attempted to lease the remaining property for commercial development. Further, various borough planning and zoning documents indicated possible intent for commercial use. Thus, a 1972 zoning ordinance and 1977 zoning map placed Mathis Plaza in a "Special Economic Development" zone, where commercial or residential uses would be permitted.

Moreover, there is no indication of any formal dedication of Mathis Plaza to park or recreational use. The 1971 Master Plan and the 1972 borough map designated certain tracts as parklands, but Mathis Plaza was not among them. As part of its 1977 Green Acres application, the borough was required to complete a DEP form entitled "Recreation and Open Space Inventory", listing two types of properties, "Developed Park and Recreation Areas" and "Undeveloped Lands ... Designated for Open Space, Recreation or Conservation Purposes." The borough did not list any of the Mathis Plaza property on either of the inventories it submitted to the DEP in 1977. According to the DEP, such inventories have regularly been required as

part of a grant application, and have been used to determine what properties would be subject to the sale restrictions set forth in DEP regulations and individual local grant contracts. The inventories, along with the final grant agreements, generally have also been filed with the clerk's office for the county in which the relevant properties are located, as constructive notice of the restrictions on their future sale.

The Law Division determined on this record that prior to the receipt of Green Acres funds for development of a ballfield at a separate site in 1978, the borough owned and held Mathis Plaza and permitted and assisted in its recreational use by borough residents. The court also acknowledged that the borough at the same time held Mathis Plaza with an intention of realizing its future economic value through its commercial use. Nevertheless, the court concluded that, regardless of any other intended purpose, the borough held the property for recreational use at the time of its acceptance of Green Acres funds and that this authorized and actual recreational use sufficed to invoke the restrictions of *N.J.S.A.* 13:8A–47b with respect to the sale of the property. The Appellate Division did not disturb the trial court's finding that the property was actually used for recreational purposes with official authorization or permission of the municipality. However, the appellate court concluded that under the circumstances, that use was insufficient to trigger the restriction of subsection 47b. It construed the statute as requiring a "municipal resolve permanently to devote" such lands to recreation or conservation, 233 *N.J.Super.* at 343, 558 *A.*2d 1351. Its review of the evidence under that narrow standard led to the conclusion that the borough did not hold Mathis Plaza with a resolve permanently to devote that property to recreational purposes.

## II.

The critical subsection of the 1975 Green Acres Act in its entirety reads:

A local unit which receives a grant under this act shall not dispose of or divert to a use for other than recreation and conservation purposes any lands held by such local unit for such purposes at the time of receipt of said grant without the approval of the commissioner [of the DEP] and the State House Commission and following a public hearing by the local unit at least 1 month prior to any such approvals. [*N.J.S.A.* 13:8A–47b.]

The plain language of the statute lends itself to the interpretation that municipally-owned or -held properties that are actually used for recreational and conservation purposes fall within the ambit of the 1975 Green Acres restrictions on future sales. Subsection 47b defines the subject properties as "any lands held by such local unit for such purposes." There is no significant interpretative problem engendered by the phrase "held by." It denotes municipal ownership, possession, control, maintenance, and the like. *See Wasser & Winters Company v. Jefferson County*, 84 *Wash.*2d 597, 599, 528 *P.*2d 471, 472–73 (1974). Here, the borough obviously "held" Mathis Plaza. It is the interpretation of the statute's qualifying phrase "for such purposes" that is critical to whether the restriction on future sale may apply.

The "purposes" that are specified in the statutory restriction are "recreation and conservation purposes." *N.J.S.A.* 13:84–47b. These purposes are expressly defined in the 1975 Act:

Use of lands for parks, natural areas, historic areas, forests, camping, fishing, water reserves, wildlife, reservoirs, hunting, boating, winter sports and similar uses for either public outdoor recreation or conservation of natural resources, or both. [*N.J.S.A.* 13:8A–37(f).]

This language also indicates the meaning of the restriction of subsection 47b. Given its normal intendment or ordinary understanding, the statutory language reasonably suggests that any lands owned by a municipality, if actually used for the enumerated purposes at the time of a Green Acres grant, will become subject to the restrictions of subsection 47b.

An analysis of the language of subsection 47b does not particularly support the narrower interpretation preferred by the Appellate Division. Nevertheless, the opposite results concerning statutory meaning reached by the lower courts on these facts suggest that the language of *N.J.S.A.* 13:8A–47b is ame-

nable to different constructions. To the extent that evidences an inherent ambiguity concerning the legislative meaning of "lands held by such local unit for such purposes," resort to aids to interpretation beyond the language of the statute is warranted. *See State v. Churchdale Leasing, Inc.*, 115 *N.J.* 83, 101, 557 *A.*2d 277 (1989).

■ The history of an enactment can assist courts in determining legislative meaning. *Brewer v. Porch*, 53 *N.J.* 167, 174, 249 *A.*2d 388 (1969). The statutory antecedents of the current provision of subsection 47b are instructive for a sound understanding of its meaning. The precedent Green Acres Acts of 1961 and 1971 each required State approvals of future sales of those lands acquired with State-provided funding for Green Acres purposes. Thus, the 1961 Act provided:

> Lands acquired by a local unit with the aid of a grant under this act shall not be disposed of or diverted to a use for other than recreation and conservation purposes without the approval of the commissioner [of the DEP's predecessor agency] and the State House Commission. [*N.J.S.A.* 13:8A–13(a).]

The 1971 Act contained a similar provision, with the addition of a requirement for a public hearing. *N.J.S.A.* 13:8A–31a. Thus, those statutes had restricted the sale only of lands actually acquired with State funds. When the Legislature added subsection 47b in the 1975 Act, it extended the restriction to all conservation and recreational lands already owned by a municipality at the time it received State funds for additional acquisition or development. The inference to be drawn from this addition is that the Legislature intended to prevent municipalities from using State funds to purchase or develop new properties, while converting comparable existing lands to more profitable commercial or residential development. Thus, subsection 47b was designed to fulfill the Green Acres objective of augmenting the overall amount of land devoted to recreation and conservation, and to ensure that municipalities would preserve existing lands devoted to Green Acres uses, whenever they look to the State for Green Acres funding to acquire or develop

additional properties. The language of the subsection comports with that intendment.

Assistance in interpreting a statute can also be derived from the understanding of the administrative agency charged with enforcing it. *In re Board of Educ. of Boonton,* 99 *N.J.* 523, 534, 494 *A.*2d 279 (1985), *cert. denied,* 475 *U.S.* 1072, 106 *S.Ct.* 1388, 89 *L.Ed.2d* 613 (1986); *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 69–70, 389 *A.*2d 465 (1978). The meaning ascribed to legislation by the administrative agency responsible for its implementation, including the agency's contemporaneous construction, long usage, and practical interpretation, is persuasive evidence of the Legislature's understanding of its enactment. *Malone v. Fender,* 80 *N.J.* 129, 137, 402 *A.*2d 240 (1979); *Smith v. Director, Div. of Taxation,* 108 *N.J.* 19, 25–26, 527 *A.*2d 843 (1987).

Here, the legislative purpose of increasing the amount of land devoted to conservation and recreation is underscored by an examination of the course of administration of the Green Acres program by the DEP. The regulations in effect when South Toms River received Green Acres funding in 1978 required State-level approvals for the sale of any properties owned, dedicated, or maintained by the municipality for recreational purposes:

> Upon receipt of an acquisition or development grant, other lands owned, dedicated or maintained for public recreation or conservation purposes by the local unit may not be diverted or disposed for uses other than those of public recreation or conservation without the prior approval of the commissioner and the State House Commission. [*N.J.A.C.* 7:36–1.8(m) (1978).]

The regulation thus indicates that the language of *N.J.S.A.* 13:8A–47b, *i.e.,* "held by such local unit for [recreational and conservation] purposes," is roughly synonymous with land "owned, dedicated or maintained" for such purposes. That administrative understanding is further confirmed by the agency practice and application as reflected by the provisions of its local grant contracts. These agreements govern the exact terms of the DEP's funding of particular projects, and must

ordinarily be accepted by a municipality before funding is received. In this case, for example, the project agreement dated January 27, 1978, governing the South Toms River grant, provided:

No other lands owned, dedicated or maintained for recreation or conservation purposes by Local Unit shall be diverted to a noncompatible use or disposed of without the approval of the Commissioner and the State House Commission.

In sum, the understanding and practices of the DEP, the agency charged with enforcement of Green Acres legislation, as reflected in its regulations and grant contracts applying subsection 47b, imply that the subsection is intended to include all properties "owned, dedicated or maintained" by a municipality for recreation or conservation.

■ An examination of the overall policy and purpose of the statute provides additional assistance in its correct interpretation. The construction that will best effectuate the statute's ultimate objectives is to be preferred. *Accountemps Div. of Robert Half of Philadelphia, Inc. v. Birch Tree Group, Ltd.*, 115 *N.J.* 614, 622–623, 560 *A.*2d 663 (1989); *Waterfront Comm'n of New York Harbor v. Mercedes–Benz of N. America, Inc.*, 99 *N.J.* 402, 414, 493 *A.*2d 504 (1985).

With respect to the overall purpose of the Green Acres statute, the Legislature, in adopting the 1975 Green Acres Act, found that:

*Lands now provided* for [recreational and conservation] purposes *will not be adequate* to meet the needs of an expanding population *in years to come....* [Funding appropriated under the companion bond act] is needed at this time ... *to augment* the lands acquired for the people of New Jersey.... [*N.J.S.A.* 13:8A–36b and 13:8A–36f (emphasis added).]

This language expresses not only the Legislature's overall purpose in adopting the 1975 Act, but indeed, the purpose of the entire scheme reflected in that Act and its two predecessors. The Legislature determined to assist municipalities with State funding to add to the total amount of lands devoted to recreational and conservation use. Thus, the Legislature intended that under the Green Acres program, municipalities would be encouraged to preserve present recreational and con-

servation properties, as well as to acquire and develop more properties devoted to those purposes.

Respondent Stanzione contends that regardless of actual use, an official municipal dedication to the purposes specified in the 1975 Green Acres Act would be necessary in order to subject the sale of a property to State-level approvals. The Appellate Division, although it would not specifically require formal or official "dedication" to subject the property to subsection 47b, adopted a standard nearly as exacting as that urged by respondent. It determined that the statutory restriction requires "a municipal resolve permanently to devote the lands" to conservation or recreation. 233 *N.J.Super.* at 343, 558 *A.*2d 1351. This understanding, however, does not emanate from the language of the statute itself, is not compelled by the history of the enactment, does not coincide with the prevailing administrative perception of the statutory scheme, and does not effectively advance the essential purpose of the Green Acres program. To reiterate, the DEP regulation and contract language, "owned, dedicated or maintained," implies that subsection 47b was intended to govern properties actually used—"maintained"—for Green Acres purposes even though a municipality has not formally and permanently dedicated such property to Green Acres uses. We are satisfied that that administrative interpretation, focusing as it does on the actual use of municipal properties, correctly grasps and expresses the basic legislative intent. The purpose of the additional restriction of the 1975 Act is to prevent municipalities from selling existing recreational or conservation lands on receipt of Green Acres funding for the acquisition or improvement of additional sites.

█ It follows that even a formal municipal dedication of property to non-Green Acres purposes will not obviate the restriction on its future sale if that property is otherwise actually used for recreational or conservation purposes. Municipal determinations, regardless of form, that do not affect the actual use of properties cannot be dispositive of their character

for Green Acres purposes. Thus, in this case, such official municipal determinations, *e.g.*, those reflected in master plans, zoning ordinances, or tax maps, that do not coincide with actual use cannot alone establish the character or nature of properties sufficiently to exempt them from the sales restrictions of the 1975 Act.

The Appellate Division also refused to apply subsection 47b to the sale of Mathis Plaza at least partly because of its concerns over what it viewed as three untoward practical effects of such application. That court feared that a broad application of the statute might undermine municipal compliance with DEP funding-application procedures, might indeed even discourage applications, or might force municipalities to prohibit casual, informal public uses of municipally-owned land. However, we find each of these concerns is too attenuated to impede an application of the statute designed best to protect recreational and conservation lands.

The Appellate Division, consistent with its view that the 1975 Green Acres Act contemplated a permanent dedication of lands to recreational and conservation uses, was influenced by the fact that the municipality here did not include Mathis Plaza in its overall designation of such lands on the DEP inventories submitted with the grant application. We do not believe that under the Green Acres preservation and acquisition scheme, either the Legislature or the DEP anticipated that such inventories would be controlling or persuasive on the question of whether particular property is used for Green Acres purposes. At oral argument, counsel for the DEP noted that it is not possible for that agency to investigate whether municipalities have failed to disclose all recreational or conservation properties on such inventories. This information is peculiarly within the knowledge of the municipality, and it would frustrate the purposes of the statute and the Green Acres program to give dispositive effect to the municipally-prepared inventory and to foreclose later challenges to a municipality's omission of particular lands from such an inventory.

The Appellate Division further reasoned that a construction of subsection 47b that would apply to such property as Mathis Plaza would militate against fulfillment of the purposes of the Green Acres legislation. It surmised that municipalities might be discouraged from applying for Green Acres funding. 233 *N.J.Super.* at 343, 558 *A.*2d 1351. However, the possibility that such an understanding of the statute would discourage applications for funds is remote. The DEP has pointed out that applications for Green Acres funds well exceed its financial resources, despite its longstanding and consistent interpretation and application of subsection 47b.

The Appellate Division also conjectured that if subsection 47b were applied to properties actually used for, but not permanently committed to, conservation and recreational purposes, municipalities might be discouraged from permitting even passive recreational or conservation uses, particularly when the municipality harbored an intention that such property might be used for future commercial development. 233 *N.J.Super.* at 343, 558 *A.*2d 1351. The Appellate Division suggested that such passive uses can serve the interests of the citizens and should not be inhibited by applying the Green Acres restrictions to properties so used.

The appellate court, we believe, exaggerated the threat to potential beneficial public uses that are "passive" in nature. The "recreation and conservation purposes" included within the statute are "parks, natural areas, historic areas, forests, camping, fishing, water reserves, wildlife, reservoirs, hunting, boating, winter sports and similar uses." *N.J.S.A.* 13:8A–37(f). The Appellate Division rightly noted that many of the foregoing uses, *e.g.*, natural areas or forests, can be "passive" in the sense that they can exist with little or no municipal action or encouragement. In this regard, the Appellate Division was apparently concerned that subsection 47b potentially could be applied to all land owned by a municipality that remained in a natural or unimproved state. Thus, a municipality would be forced to prevent the public from using vacant municipal land

for recreation if it wanted to preserve its ability to use the land for other purposes. In the view of the Appellate Division, this exigency would unduly fetter or interfere with municipal land management and titles. 233 *N.J.Super.* at 342, 558 *A.*2d 1351.

In theory, the kind of passive use envisaged by the Appellate Division should not be discouraged; but this case does not entail such use. Rather, the use exemplified by the record here was one actively and consciously supported by the municipality; it certainly was not "passive" in the sense that it arose only through municipal ignorance or indifference, or that its enjoyment by the public did not have ongoing municipal support and encouragement. We do not believe the Legislature or the DEP has ever intended that property would be subject to the constraints of the statute if it is merely casually "used" by the public without any assistance, permission, or even perhaps, without awareness of such use, by officials of the municipality.

■ In sum, the language of the enactment, its statutory history, administrative agency interpretation and practice, and legislative purpose combine to indicate that subsection 47b of the 1975 Act requires State approval for the sale of existing parklands and recreational lands, if the municipality receives Green Acres funding. The underlying policy of Green Acres legislation, *i.e.*, the expansion of lands throughout the state for recreation and conservation, is best served if a property is deemed held by a municipality for recreational or conservation purposes, whenever it has been actually used for such purposes with the condonation or authorization of the municipality. In a given case, such actual, approved use would have to be determined by examination of all relevant facts concerning whether a municipality was aware of such use, whether it supported and encouraged the use, and whether the municipality had taken any official action to allow the property to be used for such purposes. However, in keeping with the *caveat* that an official municipal declaration cannot in itself be dispositive, even if a municipality appears to have intended such property for com-

mercial development, where such development remains wholly executory, any such intent would not outweigh the property's actual and approved use for recreation or conservation.

### III.

■  Here, the Borough of South Toms River authorized the recreational use of Mathis Plaza by its residents. The borough, at various times, provided municipal services, purchased equipment, maintained the property, and collected revenues from its recreational use. Although the evidence supports a finding that the borough also intended eventual commercial development of Mathis Plaza, such intent remained unexecuted at the time of the 1978 Green Acres grant. We therefore hold that the sale of Mathis Plaza is subject to the requirements of *N.J.S.A.* 13:8A–47b.

The judgment of the Appellate Division is reversed; the judgment of the Law Division is reinstated.

GARIBALDI, J., dissenting.

In 1935 the Borough of South Toms River ("Borough") acquired an undeveloped tract of land from the State. The deed contains no restrictions on the property's use. The tract, commonly known as Mathis Plaza, consists of four lots that are numbered 1 through 4 on the Borough's tax map.

For the last forty years, lots 2 and 4 of Mathis Plaza have been continually leased for commercial purposes. Lots 1 and 3 remained virtually vacant. Lot 3, the lot in issue, is situated between the commercially-used lots, 2 and 4. From 1961, if not earlier, the Borough has continually sought to develop lot 3 for commercial or residential use. Despite the Borough's efforts throughout the years, no bids met its criteria until 1984, when respondent Alphonse Stanzione successfully bid $330,000 for the entire Mathis Plaza tract.

On January 27, 1978, the Borough received a Green Acres grant of $27,500 to improve land for a baseball park. As a

condition of that grant, *N.J.S.A.* 13:8A–47(b) (subsection 47b) of the Green Acres Land Acquisition and Recreation Opportunities Act of 1975 ("1975 Act") required that "a local unit which receives a grant under this act shall not dispose of or divert to a use for other than recreation or conservation purposes any lands *held* by such local unit for such purposes [recreation or conservation] at the time of receipt of said grant." (emphasis added).

During the years that the Borough was seeking to develop lot 3 commercially, it did not fence the vacant lot but permitted its residents to use the property occasionally for *ad hoc* recreational purposes. The question, therefore, is whether land that a local unit holds primarily for commercial development but that it permits its citizens to use incidentally for recreation is held for "recreation and conservation" pursuant to subsection 47b.

The Appellate Division, reversing the trial court, held that "[a]lthough lot 3 was being used for recreation purposes in 1978, it was not 'held by' the borough for that purpose within the meaning of subsection 47b." 233 *N.J.Super.* 336, 340, 558 *A.*2d 1351 (1989). The Appellate Division reasoned that "held" within the intent of subsection 47b "requires a showing of more than active or passive use." *Id.* at 343, 558 *A.*2d 1351. It concluded that subsection 47b applies only to "lands used or reserved for recreation and conservation purposes by a local unit with a municipal resolve permanently to devote the lands to those uses." *Id.* at 343, 558 *A.*2d 1351. It therefore would not prevent the sale of the Mathis Plaza tract to Stanzione.

The majority reverses the Appellate Division. Its litmus test is that "property is deemed held by a municipality for recreational or conservation purposes, whenever it has been actually used for such purposes with the condonation or authorization of the municipality." *Ante* at 217, 584 *A.*2d at 792. Moreover, "even if a municipality appears to have intended such property for commercial development, where such development remains wholly executory, any such intent would not outweigh the

property's actual and approved use for recreation or conservation." *Ibid.*

As in all cases requiring statutory interpretation, the key question is what did the Legislature intend. *See AMN, Inc. v. South Brunswick Township Rent Leveling Bd.,* 93 *N.J.* 518, 525, 461 *A.*2d 1138 (1983). The Legislature enacted separate Green Acres Acts in 1961, 1971, and 1975, all of which had the general purpose to increase and preserve public lands for recreational and conservation purposes. *N.J.S.A.* 13:8A–1 to –34. All the Green Acres Acts enabled the State to grant funds to local units so they could acquire and develop lands consistent with the goal of the Green Acres legislation.

In the 1975 Act, the Legislature enacted subsection 47b to prevent local units from acquiring new Green Acres land at State expense while contemporaneously selling land that it previously held for recreation or conservation. The statutory language, the legislative history, and public policy support the conclusion that the Legislature did not intend subsection 47b to restrict the right of a local unit to sell land that it held predominantly for commercial development when it received a Green Acres grant, but that members of the public used occasionally for recreational purposes.

The majority's interpretation exceeds the Legislature's intent. Prior to the adoption of subsection 47b, the Green Acres Acts had not placed any statutory restrictions on diversion of pre-existing recreation lands. Prior to the adoption of the 1975 Act, the Department of Environmental Protection (DEP), which administered the program, used with local units receiving Green Acres funds a standard form contract that contained a provision requiring that the local unit "not dispose of or divert to another use any lands now *used* for recreation or conservation" without State approval. 233 *N.J.Super.* at 341, 558 *A.*2d 1351 (emphasis added). In describing pre-existing lands subject to the new restrictions of the 1975 Act, the Legislature did not adopt the DEP's language of *"used* for recreational purposes"

but instead adopted the more restrictive and formal phrase *"held by* [local units] ... for recreation and conservation purposes." (emphasis added).

No explanation for the change is provided in legislative history. It is presumed that a Legislature intends statutory language to have its ordinary and well understood meaning unless a special meaning is clearly indicated. *Levin v. Township of Parsippany–Troy Hills,* 82 *N.J.* 174, 182, 411 *A.*2d 704 (1980). The Legislature is deemed to be aware of all existing laws, *Brewer v. Porch,* 53 *N.J.* 167, 174, 249 *A.*2d 388 (1969), and administrative regulations construing such laws, when it enacts new statutory provisions. Generally, a legislature is presumed to be aware of established administrative practices and to promulgate its enactment with those in mind. *Lorillard v. Pons,* 434 *U.S.* 575, 581–82, 98 *S.Ct.* 866, 870–71, 55 *L.Ed.*2d 40, 46–47 (1978) (legislative "willingness to depart from those provisions regarded as undesirable or inappropriate for incorporation" is clearly expressed by the selectivity of and modifications to certain provisions before the legislature). The Legislature's decision to enact a provision at variance with the language used by the administrative agency is significant.

By substituting the phrase "held by" for the word "used" that the DEP had previously employed, the Legislature manifested its intent to substitute the concept of ownership and possession for use. The regulations governing Green Acres grants also support this interpretation. *N.J.A.C.* 7:36–1.8(k) restricts diversion to "other lands *owned, dedicated or maintained* for public recreation or conservation purposes * * *." (emphasis added). That regulation was first adopted in October 1977. See *R.* 1977 *d.* 395, 7:36–1.8(1). The DEP has used contract language mirroring the regulations and providing: "No other lands presently *owned, dedicated or maintained* for recreation or conservation purposes by the local unit shall be diverted...." *See Kauffman v. Mayor of N. Haledon,* 229 *N.J.Super.* 349, 355, 551 *A.*2d 564 (Law Div.1988).

Likewise, the Proposed Development Agreement the Borough entered with the State, in connection with its $27,500 1978 Green Acres grant, provides that the Borough would not divert any "other lands *owned, dedicated or maintained* for recreation or conservation purposes." These terms used in the regulations, the DEP standard contract, and the contract in this case—"owned, dedicated and maintained"—furnish additional support for the conclusion that more than occasional recreational "use" is needed to support a subsection 47b restriction.

Subsection 47b has been addressed twice by our courts and neither of those cases presents a close question regarding the status of the property. *See Kaufmann v. Mayor of N. Haledon, supra,* 229 *N.J.Super.* 349, 551 *A.*2d 564 (Law Div.1988) (finding land previously zoned as "open space" to be subject to subsection 47(b)); *Borough of Demarest v. State,* 148 *N.J.Super.* 322, 372 *A.*2d 656 (Ch.Div.1977) (finding existing parklands at time of grant to be subject to Green Acres restrictions).

Subsection 47b would apply if, in 1978, the Borough were holding lot 3 for purposes of recreation and conservation. What then do we look at in determining the Borough's intention? We look to the formal actions of its governing body. Those actions show that the Borough consistently intended this property to be held for commercial development. The Borough never deviated from that intention.

The evidence is overwhelming that from at least 1961, the Borough intended to develop lot 3 commercially, and merely permitted its residents to use the lot occasionally for recreational purposes.

On June 12, 1961, the borough council adopted a motion "that a For Lease sign be erected on Mathis Plaza." The minutes of the August 28, 1961 council meeting reflect a request by the then-mayor "that bids on the Mathis Plaza be held off until such time as he is able to look over plans." The same minutes reflect the filing of a petition with the council requesting that the lease of Mathis Plaza be placed on the general election ballot. At its August 18, 1962 meeting, the council adopted a resolution placing the Mathis Plaza question on the ballot. The record does not indicate whether the question was indeed placed on the ballot in November 1962 or, if so, the result of the vote.

However, on July 8, 1963, the council adopted a motion to hire a real estate consultant "in regards to the leasing of Mathis Plaza...." One year later, on August 10, 1964, the council adopted a motion to advertise "in regards to the leasing of Mathis Plaza." The minutes of an October 15, 1964 special meeting established that the council held for further study a bid for Mathis Plaza from Nassau Marine. The bid contained no price and was for the use of Mathis Plaza for parking in conjunction with the docking of "a steam operated passenger vessel...."

[233 *N.J.Super.* at 343–44, 558 *A.*2d 1351].

There were no further developments until November 12, 1973, when the Borough retained its real-estate appraiser to update his earlier appraisal of Mathis Plaza. Significantly, on February 11, 1974, the Borough Council adopted a resolution that stated that it was the "desire of Mayor and Council to secure the highest and best use" for Mathis Plaza under the terms of a long-term lease and for the tenant to erect an improvement with a value of at least $1,000,000 and with an annual basis of $850,000. The resolution further provided that the Borough's request for bids shall recommend as a highest and best use for the property, a marina, motel, restaurant, or condominium/townhouse complex. As the Appellate Division concluded:

[T]hree years before the Green Acres application, the council, consistent with its earlier efforts, was attempting to return [the vacant portion of] Mathis Plaza ... to the private sector for what the council considered to be the property's highest and best use, *a site for commercial development.*

[233 *N.J.Super.* at 345, 558 *A.*2d 1351 (emphasis added)].

It makes no sense that a Borough, seeking a tenant in year one for a long-term lease for property with a gross rental value of $850,000 and imposing the condition that improvements costing not less than $1,000,000 be made, would take $27,500 in unrelated Green Acres money in year three and foreclose its right to future proceeds from the sale or lease of such property.

Moreover, those attempts by the Borough to develop the land commercially were consistent with the Borough's land use plan. The 1971 Master Plan's community facilities element excluded Mathis Plaza from lands designated as parks and playgrounds. In the land use element,

Mathis Plaza was placed in the Special Economic Development zone, although other lands were described as public/conservation.

In 1972, the official map designated seven tracts for playgrounds, parks or conservation lands. Mathis Plaza was excluded from these designations.

Consistent with the Master Plan, the 1972 zoning ordinance placed Mathis Plaza in the Special Economic Development (SED) zone which permitted "offices for business and professional uses, research laboratories, retail uses permitted in the B–1 zone, and garden apartment developments...." Mathis Plaza continued to be zoned SED when the borough received the Green Acres grant. [*Ibid.*]

Prior to accepting Green Acres funding a local unit must complete a "Recreation and Open Space Inventory." On that Inventory the local unit must list all developed park and recreation areas and undeveloped lands owned by the local unit and designated for open space, recreation, or conservation purposes. *N.J.A.C.* 7:36–1.8(b)(2). Although certain public vacant land was listed on the Inventory, the Borough did not list Mathis Plaza as being held by it for recreation or conservation purposes. The parties agree that the Borough omitted Mathis Plaza in good faith in the belief that the tract was not held for recreational or conservation use.

As the Appellate Division correctly concluded:

Although a local unit's failure to include a tract in the inventory is not a conclusive bar to § 47(b)'s applicability, it is highly probative of municipal intent when accompanied by other indicia of that intent.

[233 *N.J.Super.* at 345, 558 *A.*2d 1351]

Likewise, the zoning map prepared in May 1985, as well as the Borough's new Land Use Ordinance, designated the area including Mathis Plaza as "marine" and "residential."

During the time that Mathis Plaza was the subject of the Borough's efforts to realize its highest commercial value, Mathis Plaza lay vacant. Admittedly, the Borough did not fence off the area or otherwise deny the public access to the undeveloped property. However, an examination of the testimony from the five residents of the town explaining the recreational use of lot 3 reveals how unorganized and sporadic such use was. Certain events and activities, such as fishing off the bulkhead and a demonstration of water safety, were permitted. In addition, a

World War monument was apparently placed in Mathis Plaza, but testimony at trial indicated that it became obscured on account of overgrown grass or was removed prior to the year in which the Borough received its Green Acres grant. The people who used the bulkhead of Mathis Plaza for docking paid a fee to the Borough for that use, although the testimony at trial indicated, at least in part, that the collection of those fees may have begun after the Borough's receipt of the Green Acres monies. Finally, documentary evidence showed that certain equipment such as benches and grills were placed on the property in 1979, after the Green Acres grant was received and thus after any recreational uses of the property were relevant.

Every official act of the Borough demonstrates that the Borough intended to hold the property for commercial development. Against this anecdotal evidence of sporadic use, the Borough submitted resolutions, motions, mappings, and plans that convincingly establish that the Borough held the Mathis Plaza tract for commercial development. Such documented evidence, while not decisive, certainly is relevant in determining whether the property was held in 1978 for recreation or for commercial development. Yet, the DEP official "in charge of administering the legal side of all the Green Acres bond issues" testified that he could not recall reviewing those documents when the DEP made its decision that the Mathis Plaza tract was subject to the Green Acres Act.

In this case, where the evidence is overwhelming that the property is held predominantly for commercial or residential development and merely used occasionally by residents for recreational purposes, it should not be subject to Green Acres restriction. However, there will undoubtedly be cases in which the evidence is not so overwhelming. In those cases of dual purpose I think that the inquiry should be: what was the "primary purpose" for which the local unit held the land at the time of the Green Acres grant?

Concededly, that inquiry does not provide for a bright line determination of "purpose." Nonetheless, it is a fair resolution that furthers the goal of Green Acres legislation by allowing citizens to engage in intermittent recreational activities on a lot that otherwise serves no present purpose. A factual determination will have to be made to determine the local unit's primary purpose in holding the land. Some of the factors to be considered include:

1.  the examination of all the local unit's official acts concerning the property;

2.  the consistency of the asserted purpose with the zoning and other land-use plans of the local unit;

3.  the zoning of the property;

4.  the existence of written projections or agreements for future commercial development;

5.  the existence of a formal dedication for the lot's purpose;

6.  the attempts at commercial development, including, *inter alia*, advertisements;

7.  the local unit's assessment of the lot in its inventory listing; and

8.  the extent and continuity of recreational activities, including expenditures and receipts.

I note that this case also involves two countervailing public policies, the policy that restrictions on the alienability of land are to be strictly construed and the policy of preserving and increasing recreational lands. Where there are two such countervailing policies, the courts should use a reasonableness test when determining exceptions to the rule against restraint on alienability. *See Greco v. Greco,* 160 *N.J.Super.* 98, 104, 388 *A.*2d 1308 (App.Div.1978) ("We recognize that restraints on alienation must be reasonable...."); *Brace v. Black,* 51 *N.J. Super.* 572, 584, 144 *A.*2d 385 (App.Div.1958) (invalidating a deed's provision which was "an unreasonable and unjustified restraint on alienation"); *see also Coast Bank v. Minderhout,*

61 *Cal.*2d 311, 38 *Cal.Rptr.* 505, 392 *P.*2d 265 (1964) (delineating only a small number of reasonable exceptions to the rule against restraints on alienation); *cf. Malouff v. Midland Fed. Sav. & Loan Assn,* 181 *Colo.* 294, 509 *P.*2d 1240, 1243 (1973) ("We subscribe to the view that the question of the invalidity of a restraint depends upon its reasonableness in view of the justifiable interests of the parties."). Despite a countervailing "recognized legitimate interest," a contractual clause can be an unreasonable restraint on alienation, and even "reasonable restraints ... will be construed to operate within their exact limits." *Bingaman v. Valley Sav. & Loan,* 97 *N.M.* 8, 12, 636 *P.*2d 279, 283 (1981). In this case, the majority has unreasonably restricted the alienability of the entire Mathis tract, because some of it was always commercially developed and all of it was held for commercial development.

The majority fails to address what a municipality must do to ensure that property it is holding for future commercial development is not deemed to be held for recreational purposes because of occasional recreational use by the public. Short of barring any citizen from using the property for occasional recreational uses, a feat to be accomplished under the majority's opinion, I suspect, only by fencing the property, a municipality can do very little.

Municipalities need money. This is an important problem today. Nevertheless, the majority invalidates a rather large sale by the Borough. In these days of sluggish economic development, few areas are currently being developed, but many are being held for future development. Should even the possibility of future Green Acres applications exist, the majority puts municipalities on notice that they must either prohibit *any* use of undeveloped lands that are being held for future commercial development or execute otherwise unappealing transactions now. Both of those alternatives frustrate the objective of the Green Acres program and can provide only net losses to the communities involved.

As the Appellate Division recognized, "if mere active or passive use of municipal lands triggers § 47(b) restrictions, * * * the temporary use of undeveloped municipal land for recreation or conservation purposes" would be prevented. 233 *N.J.Super.* at 343, 558 *A.*2d 1351. A local unit should be permitted to allow its citizens to use vacant, but commercially-zoned, land for recreation pending commercial development of the land. Local units should not be compelled to fence off vacant land from the public for fear that DEP may one day claim that it is subject to the Act because the permitted recreation uses have met some vague and unarticulated threshold. That result directly conflicts with the legislative effort to expand—not diminish—land for public recreation.

I would affirm the judgment of the Appellate Division.

*For reversal and reinstatement*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and STEIN—6.

*For affirmance*—Justice GARIBALDI—1.